REDMANN, Chief Judge.
Delta Marine Contractors, Inc. appeals from a judgment in favor of Avondale Shipyards for $270,215.84 damages for breach of two Navy shipbuilding subcontracts. Delta contends that breaches by Avondale caused Delta’s noncompletion of its contracts. But the primary contention of Delta’s reconventional demand is that, in any case, Avondale owes Delta $4,000,000 in price adjustments under these and similar contracts on Navy ships and $7,000,000 damages for a judicial sequestration that put Delta out of business. Delta further contends that Avondale did not prove the costs of completion awarded on the two contracts Avondale sued on.
We conclude that Avondale did prove its cost of completion, although the correct measure of damages is not cost but excess cost of completion; that equitable adjustments in Delta’s prices were represented by Avondale to the Navy to be due in amounts so far in excess of Avondale’s $50,000 provisional payment that Avondale must be held to owe further equitable adjustments notwithstanding that Delta’s deficient financial records prevent a mathematical approximation of equitable adjustments; that Delta did not prove that Avondale caused Delta’s breach of contract; and that Avon-dale’s judicial seizure was not unlawful (and was in any case not the cause of Delta’s destruction).
Avondale had contracts with the Navy to build first seven and then 20 more ocean *166 escorts. Avondale subcontracted some parts of that work to Delta by “purchase orders” for fabrication alone or fabrication and installation of items such as doors and stowage fixtures.
Whether caused entirely by the Navy or in part by Avondale (as, possibly, by its need to “rebuild” two hurricane-damaged vessels it had under construction), delays of ' about two years occurred in the building of the ships, and these delays allegedly affected Delta by a variety of increased costs for which it requested but, save for a $50,000 advance by Avondale for “business interruption,” did not obtain equitable adjustment as authorized by the purchase orders and the general Navy contract. Meanwhile, Delta billed Avondale for progress payments not on the basis of percentage of completion (but not over cost plus 5%) as agreed and as recited in the billings, but instead on a basis related to Delta’s cash expenditures, including expenditures unrelated to the Avondale purchase orders. One consequence of those two factors, precipitated by Delta’s insistence on an agreement for storage charges, was that the remaining installation portion of the 20-ship stowage fixtures purchase order was canceled. (Avondale deemed the storage charges high and preferred itself to store the fabricated items; Delta believed its own installation costs would be thereby increased and Avon-dale believed Delta could not do the installation for the price assigned to it anyway.) Another consequence was that Delta became unable to complete the final portion of the two largest orders and notified Avon-dale of its intent to cease operations and sell everything it had, including all work in progress.
Avondale then judicially sequestered (and later bonded out and used) the work in progress and the material Delta had for the Avondale orders. (Delta charges the seizure went beyond those items.) Avondale itself completed the fabrication.
Avondale’s sequestration action also asked reimbursement of progress payment overbillings, return of $14,000 of its $50,000 provisional advance, and damages caused by Delta’s breach, including costs of the transportation of the sequestered items to Avon-dale.
Delta’s reconventional demand alleged that Avondale, rather than Delta, breached their contracts, first by delays and by refusal to afford equitable adjustment for the increased costs caused by the delays, and finally by the judicial seizure that Delta claims destroyed Delta as a business entity.
The trial court commissioner, in a 63-page report, recommended a judgment for Avon-dale for $270,215.84, as Avondale’s cost (sic) of completion of the Delta purchase orders (save installation but including $18,571.36 cost of transporting and warehousing the items sequestered from Delta). The trial court judge noted “difficulty in determining whether the Delta Marine claims for adjustment due to delays and disruption by the U.S. Navy were included in Avondale’s claim submission and settlement with the Navy,” but he “affirmed” the “Judgment of the Commissioner.”
We preliminarily observe that if Delta was entitled to recover its government-caused delay losses from Avondale who in turn was to recover from the Navy, Avondale’s failure to recoup those losses from the Navy does not preclude Delta’s recovery from Avondale. But we also observe that, to be entitled to recover from Avondale, Delta had to present its claims in time for Avondale to present them to the Navy for reimbursement. Delta did timely present its claims in the amounts of $199,-565 and $645,557; but Delta did not timely present its $4,000,000 upward revision of those claims. That upward revision was not claimed until the reconventional demand in this lawsuit. (And it is clear that most if not all of these claims are for Navy delay despite the contention that Avondale itself engaged in delay to force concessions from the Navy.) We therefore do not consider the upward revision of Delta’s claims notwithstanding that Delta’s brief argues this upward revision at great length.
We further observe that the basic damages for breach of a contract are not *167 cost of completion but the excess cost of completion (as even the contracts’ General Requirement 34b specified), and it is therefore irrelevant to the basic measure of damages that Delta’s progress payment billings exceeded their rightful amount. The basic measure of damages is excess of total actual cost over contract price, and total actual cost is composed of all progress payments (whether correctly calculated or not) plus the cost of completion. To put it another way, had the progress payments been less by a given number of dollars, Avondale would have owed that number of dollars more to Delta to complete the job, and therefore the difference between the amount Avondale should have paid to Delta to complete the contracts and the amount Avondale in fact paid to complete the job itself — the excess cost of completion— would be smaller by that same number of dollars. We therefore do not detail Delta’s overbillings although a large portion of record and briefs consists of evidence and argument on overbillings. (Although over-billings are in themselves a violation of the contract terms, Avondale did not claim nor establish the amount of interest arguably due because of early payment, nor any set-off from late payment; and we presume this possible element of damage was abandoned by Avondale as minimal.)
Delta breached the contracts that Avondale sued on (relative to the 20-ship contract) by failing to complete them (because of financial inability) and threatening instead to sell the fabricated items and materials it held. The federal contractual agreement gave Avondale a lien if not title to those things. Avondale’s sequestration was not proven to be excessive and, perhaps more determinative of Delta’s claim on this point, was not the cause of Delta’s destruction as a business, for Delta had previously notified Avondale that it was ceasing all operations and selling all its assets.
Furthermore, Avondale did not by its own breach of those contracts cause Delta’s failure to complete its performance. Avon-dale’s delay to accept delivery of fabricated items was anticipated and permissible under the contracts’ General Requirement 22 (although Delta was entitled to a price adjustment for costs occasioned by such a delay). Avondale’s delay in payment, especially of Delta’s late 1970 billings, was not shown to be a breach of those contracts, because Delta’s earlier billings were in excess of the agreed limitation of monthly billings to costs plus 5%; by paying the earlier billings Avondale had apparently already paid Delta more than Delta was entitled to. Avondale did owe Delta some price adjustment, but Delta could at all times have recovered its actual costs plus 5% by monthly billings (and the other contractual limit, percentage of completion times price, in fact would not have been reached). Delta was not entitled to bill any more than that (because cost plus 5% was a contractual limit on monthly billings). So Delta had no contractual right to payment of any price adjustment on those contracts until after its own performance was completed (except to the extent monthly costs plus 5% would have totaled more than the unadjusted price, a possibility that did not in fact occur). Thus no breach of those contracts by Avondale was proven to have caused Delta’s breach of those contracts, and Avondale is therefore entitled to damages. (The evidence suggests that the funds that Delta received from Avondale were quite adequate for Delta to have completed the contracts. In fact Delta funneled about $1,000,000 into an unsuccessful business project unrelated to the Avondale contracts, and that money came very largely from the Avondale contracts, the bulk in value of which was constituted by the two sued upon. It appears likely that Delta would have survived and prospered if it had merely abided the cost plus 5% billings limit, and had not engaged in its disastrous side venture.)
Avondale did breach earlier contracts with Delta (relative to the seven-ship contract) in the sense of not having “performed with good faith,” La.C.C. 1901, its obligation to “agree upon such adjustments in the ... price ... as will equitably compensate [Delta] for the increased cost in *168 curred” from suspension. Equitable adjustments were subject to Navy approval, but Avondale did obtain from the Navy a provisional adjustment of the whole seven-ship contract of over $18,000,000 in response to Avondale’s total claim of $49,255,202, which expressly included $199,565 claimed by Delta, and Avondale’s lump-sum settlements with the Navy expressly included all subcontractors’ claims and therefore waived any requirement of express Navy approval. Notwithstanding that Avondale’s final claim did not expressly include any dollar amount claimed by Delta (or any other subcontractor), nor that the final settlement of the seven-ship claim of $17,034,507 (of $80,-000,000 for both 7- and 20-ship contracts) was less than the provisional adjustment, we conclude — especially in view of Avon-dale’s written representations to the Navy that Delta had suffered losses from Navy-caused delays — that Delta was entitled to equitable adjustment on its portions of the seven-ship contract substantially greater than, say, 7/27ths of the $50,000 total for both 7- and 20-ship contracts advanced by Avondale.
Avondale’s and the trial court’s positions are not incomprehensible because Delta’s billing practices made its accounting suspect and, moreover, its supporting records were lost or destroyed to such an extent that a solid accounting verification of delay costs is not possible. And, for many obvious reasons, Delta’s added costs of fabrication of doors and fabrication and installation of stowage fixtures are not necessarily proportional to Avondale’s added costs for whole-ship fabrication. Furthermore, Avondale’s own claim included substantial, unpriced change orders. There is thus no support for a conclusion that Avondale’s receiving a certain percentage price adjustment on the whole contract proves that Delta should receive the same percentage adjustment, or even that Delta should receive the same percentage of its claim that Avondale received of its claim. Nevertheless, as Avondale’s own claim letters to the Navy asserted, Delta did suffer to some extent from the Navy-caused delays, and the contracts entitled Delta to an equitable adjustment in price.
The trial court’s failure to make any additional adjustment was due to its view that supportive evidence was lacking. Yet, in addition to Delta’s extensive accounting projection, very supportive of Delta’s 7-ship claims is Avondale’s August 28, 1970 letter to the Navy, written when Delta’s 7-ship work was largely complete. That letter is not a mere transmittal of Delta’s claim to the Navy, for it declares “Avondale has reviewed the subcontractor’s claim and comments as follows: ..,” There follows in large part a recommendation that the Delta claims be honored (although never for any specific dollar amount). We say “in large part” because, as to two of the six categories of claims, that Avondale letter advised the Navy “Avondale can find no direct relationship between the subcontractor’s additional costs and direct Government responsibility.” As to the other four categories, Avondale’s letter commented in part:
“1. Interruptions and Delays in Installation
[Delta] claims $124,813.70 .... The disruption suffered by Delta parallels the disruption suffered by both Todd shipyards and Avondale as a result of the cumulative effect of all the government actions ....
“2. Non-Standardization of Drawings
[Delta] claims $9,815.60 .... [Delta] bid ... on the basis of the specification requirements which define the stowages to be in accordance with standard BuShips drawings .... The extremely crowded nature of the ship inherent in the Government’s design made the standardization of stowages impossible, and [Delta] has been subjected to the increased costs of customized stowage ....
“3. Changes in Cylinder Stowage Requirements
Delta claims $2,310.11 .... The Government is responsible for the additional cost ....
“6. Warehousing
*169 [Delta] claims $57,336.75 .... [Delta] is entitled to the additional costs of warehousing caused by the Government-responsible delay.”
Those words are words of endorsement by Avondale of those parts of Delta’s claim, although not necessarily of their specific dollar amounts. A court of law can not allow Avondale to tell the government that the government should pay Avondale for Delta’s claim (plus 13.2% for Avondale’s profit) but then, after settling all claims with the government, tell Delta that Delta’s claim is almost worthless. Avondale cannot now make that assertion, unless Avondale can either explain away its endorsement of Delta’s claim to .the government or can show that the government expressly rejected the Delta claim. Avondale officers did testify that government auditors “had issued a non-favorable report” on the Delta claim; yet Avondale refused to give Delta any written auditors’ report to support that assertion, and did not produce it at trial. Avondale did show that the final form of its claim submission to the Navy did not expressly include any dollar amounts of any subcontractors’ claims, but that does not overcome Avondale’s earlier endorsement. If Avondale’s “review” of Delta’s claim satisfied Avondale that four of its six elements merited some payment by the government, that review should certainly have satisfied Avondale that it owed Delta some substantial agreement for equitable adjustment.
The Avondale letter-endorsement was not for the specific dollar amounts. Yet, just as Avondale rightly recognized the obligation to advise the Navy that two elements of Delta’s claim seemed unjustified, Avondale should equally have recognized an obligation to advise the Navy that the other four elements were exorbitantly overstated, if indeed that was Avondale’s view. Avon-dale’s failure to so advise the Navy is not the equivalent of accepting those elements’ dollar amounts, but in the context of equitable adjustment we deem the Avondale endorsement to estop Avondale from denying that some significant part of those elements is due.
We tend towards the view that a knowledgeable general contractor, itself entitled to similar equitable adjustments from the same causes, would ordinarily spot a subcontractor’s 100% or more over-statement of a claim for equitable adjustment, and would therefore not include such a claim in its own submission without some indication to the government in its “review and comment” of that subcontractor’s claim. Such a knowledgeable general contractor is presumably capable of making an educated estimate of the value of the subcontractor’s claim, at least within a broad margin of error.
“[T]here is an element of estimating in almost all equitable adjustments and there should be no question that estimates by knowledgeable people are relevant proof of the amount of a claim .... “At the level of the contracting parties, there is usually great awareness that estimates of the various elements of cost involved in equitable adjustment are the normal form of information which must be used to conclude the negotiation.” Nash, Government Contract Changes, 441-442.
Actual cost data is more probative than estimates, but in some cases “the boards and courts have recognized the difficulty a smaller contractor faces in keeping detailed records of actual costs and have excused the lack of such records.” Id., 443. And, although in most cases appeals boards, like government contracting officers, analyze claims on an item-by-item basis,
“In some cases, appeals boards use a much broader approach in arriving at the amount of the adjustment. When the data available and the testimony is highly complex, the appeals board will occasionally render a true jury verdict — an award of a dollar amount without any description or analysis of the elements of the adjustment. In such cases the boards weigh all of the evidence presented to them and reach a judgmental decision. These decisions are generally not in the amount requested by the contractor but are at a significantly lower figure. This *170 reflects the caution exhibited by the appeals boards when faced with the lack of concrete costs and estimating techniques on which to base their decisions. “Another technique that is used with some regularity is the granting of a jury verdict at a percentage of the ‘total cost’ amount requested by the contractor .... There are a number of cases where the appeals boards have rejected the ‘total cost’ approach but have also felt that it was unfair to give the contractor no adjustment at all. In these cases, the boards have stated that they are using the jury verdict approach to give a portion of the total cost claim. Percentages of 30%, 38⅛%, 50% and 68% have been used in this manner. Usually this is done when, in considering one portion of a contractor’s claim, there is no proof of actual costs but the total cost presentation can be related to that portion of the claim. This is a good example of the willingness of the appeals boards to grant some relief in spite of the inability of the contractor to present evidence of the costs that were incurred as a result of the change.” Id., 446.
Avondale’s own lump-sum settlement of $80,000,000 on its $169,000,000 claim may itself have been in the nature of a “jury verdict” award, for it is conceded that it was not an item-by-item award and that no specific dollar amount was attributed to any element of Avondale’s overall claim.
Especially in view of Avondale’s endorsement of most of Delta’s 7-ship claim, considered in light of Avondale’s own familiarity with delay costs on this project, we deem it plain that Avondale’s contract at least obliged it to reach some “jury verdict” type of agreement with Delta for an equitable adjustment. We cannot fault Avondale’s letter’s rejection of two of the six described elements of this claim as not attributable to government delays. But the remaining four elements, totalling $194,276.16 (ignoring Delta’s later increases, never timely submitted to Avondale), were endorsed by Avondale to the Navy (though not as to dollar amount), and should have produced a substantial equitable adjustment.
The $50,000 provisional adjustment that Avondale advanced for Delta’s “business interruption” was for both 7- and 20-ship claims, for which Delta’s claims (including the 1971 reduction of the 20-ship claim) totaled about $865,000. Proration of the $50,000 over the 27 ships would mean that less than $13,000 of the $50,000 is attributable to Delta’s 7-ship claim, of which $194,-276.16 was endorsed (though not specifically as to amount) by Avondale to the Navy. That seems far too little as an equitable adjustment.
We conclude that any performance “with good faith,” La.C.C. 1901, of Avondale’s contractual obligation to agree with Delta upon equitable adjustment, under all the circumstances, could not have resulted in an equitable adjustment of less than a fourth of that $194,276.16. We would therefore allow Delta a “jury verdict” credit of $48,-569.04 on its 7-ship claim. (We here note our rejection of Avondale’s construction of a January 14, 1969 agreement to oblige Delta to provide warehousing of fabricated items indefinitely without charge until Avondale needed them; the August 1970 letter’s recommendation that the Navy pay Delta’s warehousing during the delay is wholly irreconcilable with such a construction.)
Delta’s claims on the 20-ship contracts also have some justification in the government-caused delays, and to some extent they have a general endorsement by Avon-dale in another letter of August 28, 1970. But Delta itself reduced its $723,814.33 claim by about 11% to $645,557 in June 1971 because of the partial cancellation of the installation portion, and the first element of this claim, labor rate escalation ($26,400), related to installation labor, eliminating, we estimate, about 80% of that element. The extended commitment element ($330,525) was not commented on by Avondale “as it is subject to audit.” As to the loss of efficiency element ($129,514), Avondale commented to the Navy only concerning $58,870 of (non-installation) labor, saying that that *171 amount “represents a relatively small percentage of the total labor value .... Other participants ... have suffered larger percentages of inefficiency.” The non-standardization of drawings ($26,438.72) and the warehousing ($210,936.61) elements received the same favorable Avondale comment quoted above for the 7-ship claim. (Avondale itself received, of its $80,000,000 settlement, $62,965,493 attributed to the 20-ship contract, on which it had claimed a total of about $120,000,000.) We deem that Avondale letter an endorsement to the Navy of about $5,280 (20%) of the $26,400 labor rate escalation, $58,870 for loss of efficiency (without rejecting the balance of that element), and $26,438.72 plus $210,-936.61 for the last two elements (without rejecting the $330,525 extended commitment element “subject to audit”), or a total of $301,525.33 (although not specifically as to amount), which must be reduced by Delta’s June 1971 reduction of 11% to $268,-357.54. As we did in the 7-ship claim, we conclude that a good faith equitable adjustment could not have been less than a fourth of those endorsed amounts, or $67,089.39. We further believe that as to the non-rejected items of $330,525 and $70,644 (loss of efficiency other than labor), at least 10% of 89% (100% reduced by 11%), or $35,704.04, would have been a minimal equitable adjustment on Delta’s 20-ship claim.
As a final offset, we allow the uncontra-dicted $8,382.65 balance that Avondale owes Delta on an unrelated $195,250 LASH spools order.
But Delta’s appeal also complains of the trial court’s use of Avondale’s accounting of its cost of completion on several grounds. We conclude that Avondale’s testimony and records support the trial court’s finding that transportation of goods from Delta to Avondale and completion of fabrication cost Avondale $270,815.84 (including overhead and profit). Only excess cost of completion is recoverable as damages, however. From the cost of completion there would have to be deducted any balance due on the adjusted contract price, including the equitable adjustment (less some part of the $50,000 provisional advance Avondale made).
The prices of the two 20-ship contracts Avondale sued on, including change orders, were $2,318,451 and $563,260, a total of $2,881,711, less the partial cancellation of installation, evaluated by Delta at the time at $189,061.52. That Delta evaluation was never expressly agreed to by Avondale, but it is consistent with the basic installation charge of $13,000 for each of 20 ships, and it is not contradicted by Avondale’s evidence. We fix those two contracts’ prices at $2,692,649.48 (not yet equitably adjusted). Of that amount Avondale paid approximately $2,650,032.78 (there are three sets of figures, within $15 of one another), leaving a balance of $42,616.70 that Avon-dale would have had to pay Delta had Delta completed the fabrication, in addition to any unpaid equitable adjustment.
We have concluded that an equitable adjustment was due of no less than $102,-793.43 on those two 20-ship contracts, although part of that must be considered paid by some part of the $50,000 provisional advance Avondale made.
Rather than assign some apportionment of that $50,000 to each of the 7- and 20-ship contracts, we reach an overall net award to Avondale as follows: $270,215.84 cost of completion, minus $42,616.70 due on basic contract prices (including change orders and cancellation), minus $102,793.43 equitable adjustment on the 20-ship contract, minus $48,509.04 equitable adjustment on the 7-ship contract, plus $50,000 provisional advance by Avondale, minus $8,382.65 unpaid on LASH spools, for a final amount of $117,854.02.
The judgment is amended to $117,854.02 plus interest from judicial demand (as awarded by the trial court), with all costs to be divided equally.