SOUTHWESTERN ENGINEERING COMPANY, Plaintiff–Appellee, Cross–Appellant,

v.

CAJUN ELECTRIC POWER COOPERATIVE, INC., Defendant–Appellant Cross–Appellee.

No. 89–3813.

United States Court of Appeals, Fifth Circuit.

Oct. 26, 1990.

John Schwab, William E. Hodgkins, Schwab & Walter, Baton Rouge, La., for defendant-appellant cross-appellee.

Davis B. Allgood, Leon Gary, Jr., Gary, Field, Landry & Dornier, Baton Rouge, La., for plaintiff-appellee cross-appellant.

Before THORNBERRY, GEE, and SMITH, Circuit Judges.

THORNBERRY, Circuit Judge:

An engineering company entered into two contracts to design and manufacture power plant components for a utility company. This appeal presents the question whether the contracts allowed the engineering company to recover unabsorbed overhead costs caused by the utility company's suspension and ultimate termination of the contracts. It also presents the question whether the engineering company was entitled to recover the full contract price. The district court held that the engineering company could recover the unabsorbed overhead costs but not the full contract price. Finding no error, we AFFIRM.

## FACTS AND PROCEDURAL HISTORY

Appellee/cross-appellant, Southwestern Engineering Company ("SWECO"), designs and manufactures equipment used to generate electric power. Appellant/cross-appellee, Cajun Electric Power Cooperative, Inc. ("Cajun"), is a utility cooperative that generates and sells electricity in southern Louisiana. In 1980, Cajun was planning to build a lignite-fired electrical power plant near Coushatta, Louisiana, to be called "Big Cajun Oxbow, Unit 1." After soliciting competitive bids, Cajun awarded two contracts to SWECO to design and fabricate a steam surface condenser and nine feedwater heaters for Big Cajun Oxbow. The parties executed a written contract for the feedwater heaters on August 25, 1980, and a contract with identical provisions for the condenser on September 22, 1980.

The contracts originally provided that the condenser and feedwater heaters were to be delivered to the plant site between August 1 and October 1, 1982. Because Cajun was to obtain its financing from the Rural Electrification Administration ("REA"), the contracts incorporated standard REA forms allowing Cajun to change the delivery dates simply by issuing a writ-

ten order. In return, SWECO had the right to request and receive an equitable adjustment in the contract prices to compensate it for any increases in the cost of its performance caused by such a change.

In August 1981 and May 1982, Cajun notified SWECO of various delays and revised delivery dates. In June 1982, Cajun again revised the delivery dates for the condenser and feedwater heaters to February 1, 1984. On April 1, 1983, Cajun notified SWECO that the project schedule was being revised as a result of delays in obtaining financing and that SWECO should completely suspend the fabrication of the condenser and feedwater heaters until further notice.

By April 1983, SWECO had completed 60% of the engineering work for the design of the heaters and condenser and had already ordered materials and accessory equipment for their fabrication scheduled for the second half of 1983. SWECO billed Cajun for the engineering work performed prior to April 1, 1983. In response to SWECO's bill, Cajun paid an installment of $28,194.00 in December 1983 and the remaining $56,388.00 in March 1984. Because SWECO was unable in 1983 to secure other contracts with appropriate delivery dates to fill the void in its manufacturing schedule caused by the suspension of Cajun's contract, SWECO took steps to reduce expenses. For example, SWECO laid off some employees.

In September 1984, it became apparent that the REA would not approve or finance the Big Cajun Oxbow project. Cajun notified SWECO by letter on September 26, 1984, that it was terminating the contracts, relying on the "termination for convenience clause" in section 5(m) of the contracts, which gave Cajun the right to terminate the contracts for any reason.

SWECO brought this action against Cajun in the United States District Court for the Middle District of Louisiana, seeking to recover the unabsorbed overhead expenses it incurred as a result of the suspension of the contracts. The court held a two-day bench trial in September 1988, after which the parties filed post-trial briefs. SWECO

argued for the first time in its post-trial brief that the contracts provided for recovery of the full contract price upon termination, not just the unabsorbed overhead. In October 1989, the district court entered written findings of fact and conclusions of law. The court awarded SWECO $685,-582.00 for unabsorbed overhead expenses, but denied recovery of the full contract price. Cajun appeals from the judgment for SWECO; SWECO appeals the denial of the full contract price.

## DISCUSSION

### A. Recovery of Unabsorbed General and Administrative Overhead upon Termination

The district court found that when Cajun suspended performance of the contracts in April 1983, SWECO was unable to find replacement work to utilize the part of its manufacturing facilities that had been set aside for the remaining months of 1983 for the fabrication of Cajun's condenser and heaters. Although SWECO reduced the costs associated with the Cajun jobs as much as possible, SWECO continued to incur overhead expenses that would have been allocated to and absorbed by the Cajun jobs. Ordinarily such fixed overhead costs are allocated to all the manufacturer's work. Because the Cajun jobs were suspended, the portion of overhead expenses during the period of suspension that would have been allocated to the Cajun jobs had to be allocated to SWECO's remaining jobs for that period. Since SWECO could not obtain replacement work, those other jobs bore a greater share of company overhead, and SWECO was forced to make up the difference from its profits.

The district court found that the equitable adjustment in the event of suspension that is called for by section 5(i) of the contracts included these overhead costs, which SWECO would not have absorbed if Cajun had not suspended performance of the contracts. Section 5(i) provides in pertinent part:

Purchaser may at any time by a written order make changes in the Technical Specifications, Contract Drawings, or the time and place of delivery. If any such change causes an increase or decrease in the cost of, or the time required for, the performance of any part of the *work* under this Contract, whether changed or not changed by any such order, an *equitable adjustment shall be made* in price or delivery, or both, and this Contract shall be modified in writing accordingly.

(Emphasis added).

The term "work," as defined in section 5(h)(8) of the contracts, "includes all labor, material, equipment and documents required to be furnished under the Contract," and Cajun argues that the only "work" performed under the contracts was the engineering work for which SWECO has already been paid. Cajun argues that the unabsorbed overhead costs were not increases in the cost of performance of the engineering work under the contract and that SWECO had no contractual right to recover the unabsorbed general and administrative overhead which had been allocated for, but not absorbed by, the Cajun jobs.

SWECO argues that the definition of "work" in section 5(h)(8) is more expansive than Cajun suggests because the word "includes" indicates that the items listed do not constitute an exclusive list. SWECO also contends that it "furnished" its plant, equipment, and labor force for the performance of the Cajun contracts in the second half of 1983 and could not divert them to other jobs at the last minute. Moreover, SWECO asserts that "work" should be interpreted consistently with the purpose of the equitable adjustment clause, which, they contend, is to compensate them fully for any costs arising from suspensions by Cajun.

Cajun maintains that the terms of its contracts do not allow for recovery of un-absorbed overhead, and that the district court erred in awarding such damages when they were excluded by the contracts.

■ SWECO, on the other hand, maintains that "equitable adjustment" is a term of art in government contracts and is always given the same interpretation.[1] *See* J. Cibinic & R. Nash, *Administration of Government Contracts* 456 (2d ed. 1985). The purpose of the equitable adjustment is to leave the parties in the same position as if the contract had not been changed. *See* R. Nash, *Government Contract Changes* 16–3 (2nd ed. 1989). "There seems to be little question that unabsorbed overhead is properly includable in an equitable adjustment if the contractor can prove that changes idled some of its facilities" and reduced the direct costs to which the overhead could be charged. *Id.* at 17–11.

Louisiana courts have rarely interpreted equitable adjustment clauses. Where Louisiana courts have awarded unabsorbed overhead expenses, they have done so as part of the damages for a breach of contract. *See, e.g., French Jordan, Inc. v. Oilfield Sales & Serv., Inc.,* 439 So.2d 523, 527 (La.App. 1st Cir.1983) (calculating damages to include an amount that would have been allocated to pay for fixed expenses); *McCarty Corp. v. Indus. Scaffolding, Inc.,* 413 So.2d 1322, 1324 (La.App. 1st Cir.1982) (noting that overhead costs are "as true a cost of doing business as are [ ] direct costs"). Apparently, Louisiana has never determined whether unabsorbed overhead expenses are recoverable costs under a contract. However, at least one Louisiana court has recognized the Nash treatise, cited above, (which in turn relies on Board of Contract Appeals and Court of Claims cases for the meaning of "equitable adjustment") as authoritative on the interpretation of an equitable adjustment clause. *See Avondale Shipyards, Inc. v. Delta Ma-*

---

**1.** Although this is not a government contract case, SWECO uses this analogy because the contracts incorporate language from a standard form contract (REA Form 198), which Cajun obtained from the REA, an agency of the federal government. Since we are dealing with language incorporated from a standard government form contract, we agree that prior interpretations of government contracts will be helpful. For guidance, we look to prior government contract cases decided by various Boards of Contract Appeals.

*rine Contractors, Inc.,* 440 So.2d 164, 169 (La.App. 4th Cir.1983).

Some cases have recognized that upon a termination for convenience, the claimant is entitled to recover overhead only on work actually performed, and that overhead costs related to the claimant's existence as an ongoing organization are not additional overhead costs caused by the delay and, therefore, are not recoverable. *See, e.g., Edgar M. Williams, Gen. Contractor,* ASBCA No. 16617, 72–2 BCA (CCH) ¶ 9734 at 45,510, 1972 WL 1428 (1972) (refusing to award overhead costs, because such overhead "would have incurred only if the terminated portion of the work had been performed"); *Technology, Inc.,* ASBCA No. 14083, 71–2 BCA (CCH) ¶ 8956 at 41,631, 1971 WL 1450 (1971) (denying unabsorbed overhead to appellant because of failure to show that overhead had been incurred prior to termination of contract).

Those cases, however, involved post-termination overhead, while in this case, SWECO seeks to recover pretermination overhead, which was incurred during the suspension period. This distinction is more clearly illustrated in *A.C.E.S., Inc.,* ASBCA No. 21417, 79–1 BCA (CCH) ¶ 13,809, 1979 WL 2350 (1979). In *A.C.E.S.,* the Board rejected a claim for post-termination overhead, but awarded recovery for pretermination unabsorbed overhead during a suspension of work. Although the contractor could not recover for continuing overhead costs incurred *after* cancellation of the contract (costs that would have been absorbed by the contract if not terminated), the contractor was "entitled to an equitable adjustment based on the underabsorption of fixed overhead for the shut down days attributable to the Government suspension." *Id.* at 67,721. Even though the suspension was followed by termination of the contract, the contractor still was allowed to recover for pretermination overhead costs occurring during the suspension period. *See id.; see also Worsham Constr. Co.,* ASBCA No. 25907, 85–2 BCA (CCH) ¶ 18,016 at 90,370, 1985 WL 16693 (1985) (awarding damages for unabsorbed overhead costs resulting from the delay and ultimate termination of contract); *Adam Barr's Son,* ASBCA No.

15178, 71–1 BCA (CCH) ¶ 8917 at 41,428, 1971 WL 1664 (1971) (awarding an overhead allowance for a sixty-seven day period of work suspension). The contractor in *A.C.E.S.* recovered the unabsorbed fixed overhead costs pursuant to a clause entitling the contractor to "an adjustment (excluding profit) ... for any increase in the cost of performance" resulting from a government-caused delay. *A.C.E.S.* at 67,721. The language of that clause is similar to section 5(i) of the contracts in this case.

■ Cajun contractually agreed to pay an equitable adjustment if its exercise of the right to delay or suspend the contracts increased costs to SWECO. Cajun's suspension of the jobs caused SWECO to pay overhead costs that would have been covered by full performance of the contracts. Because of the suspension, therefore, the cost of performance under the contract was, in effect, increased by $685,582.00. The contract language regarding equitable adjustment provides SWECO with a right to recover in just such circumstances: where suspension of the jobs created unabsorbed overhead, increasing SWECO's costs.

Cajun argues alternatively that even if the contract language would allow SWECO to recover unabsorbed overhead expenses, SWECO cannot recover, because it has not shown that the suspension or termination of the contracts was what caused the expenses. Cajun asserts that SWECO must show (1) that SWECO incurred "added" overhead costs because of the suspension, exceeding its normally incurred fixed expenses attributable to ongoing business operations, and (2) that SWECO would have obtained other jobs to absorb the added overhead if not for its commitment to the Cajun jobs. *See Guy James Constr. Co. v. Trinity Industries, Inc.,* 644 F.2d 525, 533 (5th Cir. Unit A 1981). In *Guy James* this court, applying Texas law, disallowed damages for overhead expenses because the plaintiff did not establish these two elements. The evidence in *Guy James* showed that none of the plaintiff's construction equipment was idle as a result of the delay, and that the plaintiff was unable

to identify any bids it refrained from submitting because of its continuing obligation to the delayed project. *See id.*

■■■ *Guy James* can be distinguished from the case before us, and we therefore find Cajun's reliance on it flawed. *Guy James* involved a claim for "extended overhead," while this case involves a claim for "unabsorbed overhead." "[E]xtended overhead is a concept unique to construction contracting" and is defined as the additional costs incurred when a job's performance period is prolonged. *Capital Elec. Co. v. United States*, 729 F.2d 743, 745 n. 3 (Fed.Cir.1984). Unabsorbed overhead, on the other hand, is more closely related to manufacturing cost accounting and occurs when the overhead for a fixed segment of manufacturing time must be spread out among fewer jobs, because one of the jobs assigned to that time period has been suspended or delayed. *See id.* The costs sought by SWECO, which occurred during the suspension period, are part of its ordinary fixed overhead that would normally be allocated to all jobs and not additional costs attributable to an extended performance period as in *Guy James.*

The requirement of *Guy James* that a contractor show added overhead costs, which exceed its normally incurred fixed expenses attributable to ongoing business operations, is a sound one for extended overhead but not for unabsorbed overhead. In an extended overhead situation, where a job spills over into a time frame not allocated for that job, a contractor may still be able to complete the work without incurring "added" overhead costs because of, for instance, a plant's undercapacity. In such circumstances, it would be appropriate to require a showing that the contractor has incurred added overhead costs resulting from the prolongation. *See, e.g., Daly Constr., Inc.*, VABCA No. 2792, 87–3 BCA (CCH) ¶ 20,182 at 102,150–51, 1987 WL 41331 (1987) (refusing to award damages for extended overhead because of appellant's failure to present evidence of increased costs); *Pathman Constr. Co.*, GSBCA No. 7343, 86–2 BCA (CCH) ¶ 18,897 at 95,330, 1986 WL 19760 (1986) (same).

Unabsorbed overhead cases, on the other hand, present a different situation. In such cases, damage awards are made because overhead resources have been furnished for a particular job that is subsequently suspended. Under these circumstances we would not expect to see "added" overhead costs, and, indeed, we may even see a drop in overhead costs if, for example, employees are laid off. A damage award in these cases, however, is made not because of "added" overhead costs, but because a portion of existing overhead costs, which would have been absorbed by the suspended job, must now be spread out among the remaining jobs. Therefore, the *Guy James* requirement of "added" costs cannot be applicable to unabsorbed overhead situations, such as we find in this case. SWECO cites additional cases, albeit in breach of contract settings, where the courts have not required the plaintiffs to make the showing required in *Guy James. See White v. Rimmer & Garrett, Inc.*, 340 So.2d 283, 286 (La.1976); *French Jordan, Inc. v. Oilfield Sales & Serv., Inc.*, 439 So.2d 523, 527 (La.App. 1st Cir.1983).

■■■ Cajun next argues that we should certify this case to the Louisiana Supreme Court because no Louisiana court has directly addressed the factual situation of this case by interpreting termination for convenience clauses or by addressing the appropriate burden of proof of causation. Because *Guy James* is distinguishable from the case before us, we find certification unnecessary, and we will apply the burden of proof requirements that other courts have imposed for recovery of unabsorbed overhead. We interpret the contract language following Louisiana's general rules of contract construction.

■■■ The only requirement for unabsorbed overhead is that the contractor "show some further impact of the suspension itself, such as idling of its forces due to the inability to secure replacement work because of the uncertain nature of the suspension or lack of bonding capacity." *La-Coste Builders, Inc.*, ASBCA No. 29884, 88–1 BCA (CCH) ¶ 20,360 at 102,977, 1987 WL 46145 (1987); *see also George Hyman*

*Constr. Co. v. Washington Metro. Transit Auth.*, 816 F.2d 753, 758 (D.C.Cir.1987) (awarding overhead costs to a plaintiff who demonstrated it could not have reduced home office overhead costs or acquired replacement work to absorb them); *Capital Elec. Co.*, 729 F.2d at 745–46 (awarding damages for unabsorbed overhead to plaintiff who showed it could not have taken any additional jobs during various delay periods because of the uncertainty of the delay and limitation on its bonding capacity). The district court found that SWECO had made such a showing.

 In its finding of facts, the district court held that SWECO could have secured other contracts to replace the Cajun jobs had Cajun given it greater notice of the suspension. Cajun disputes this finding by arguing that SWECO bid on every available job whose delivery dates would have coincided with the Cajun delivery dates. SWECO's employees testified that the bids submitted by SWECO prior to April 1983 on eighteen other contracts, which would have covered the period of Cajun's requested suspension, were courtesy bids that were intentionally set too high, because SWECO did not have the capacity to perform other contracts while it was performing the Cajun jobs. It submitted those bids pro forma so that customers would continue to solicit bids from it. The witnesses testified that SWECO would have pursued those jobs seriously if it had needed them. Cajun did not offer any contradictory evidence. Based on the evidence in the record, the district court's factual finding does not seem clearly erroneous.

 SWECO met the burden required for unabsorbed overhead by showing that it was unable to obtain other jobs and that its plant was idled during the suspension period. The district court specifically found that SWECO was unable to schedule other work to replace the Cajun jobs, and the evidence shows that the suspension greatly reduced SWECO's productivity. The suspension clearly inhibited performance of other projects during 1983.

**B. Recovery of the Full Contract Price**

 SWECO argues that the contracts require Cajun to pay SWECO the full contract price as termination charges. We consider this claim on its merits even though SWECO raised it for the first time in the post-trial brief. The district court could have excluded consideration of the claim based upon its absence from the pretrial stipulations, but instead exercised its discretion to consider the claim on its merits. District courts have the discretion to modify pretrial orders under Rule 16 and may take up matters on the merits which they have the discretion to exclude. *See Newman v. A.E. Staley Mfg. Co.*, 648 F.2d 330, 333 (5th Cir.1981); *Wallin v. Fuller*, 476 F.2d 1204, 1209 (5th Cir.1973). Both parties also took the opportunity to brief the issue below. Cajun anticipated in its pretrial brief that SWECO would argue that the amounts due upon termination should be calculated by reference to Schedule IV, which discusses termination charges. Cajun made the same arguments against that interpretation in its pretrial brief as it now makes on appeal. Cajun also made those arguments in its post-trial brief. Finally, the evidence necessary to consider this issue (Schedule IV) was introduced at trial. Therefore, the trial court acted within its discretion in considering this issue, and this court may also consider it.

We begin by looking at Section 5(m) of each contract, which provides in pertinent part:

> In addition to its rights under paragraph (*l*) of this Section, Purchaser may by written notice to Seller terminate performance of Work under this Contract in whole, or in part, for any reason whatsoever.... Purchaser shall pay Seller amounts due with respect to terminated work performed prior to termination plus reasonable charges incurred in terminating such work.

SWECO asserts that it is necessary to look to Schedule IV of the contracts to calculate the amounts due with respect to terminated work performed.

Schedule IV, which discusses termination charges and is found in both contracts, is a table with two columns. One column lists months passed from the time of contract formation to contract termination, and the other column lists a percentage of the contract price due corresponding to the number of months that have transpired. The introductory paragraph provides:

> In the event of cancellation of this agreement by Purchaser, the maximum cancellation charge will be those amounts indicated in the following schedule. The percentage of completion shall reflect expenses incurred and commitments made, including costs of engineering, which cannot be cancelled or diverted to other production without loss. The percentage of Contract Price due shall be based upon time of termination from the effective date of the Contract.

Cajun and the district court interpret the first sentence of this paragraph as limiting the maximum amount of cancellation charges for which Cajun can become liable, based upon when the contracts are terminated relative to the effective date of the contract. Cajun argues that under section 5(m), the amounts due are the direct costs of actually performing the work before termination and a reasonable mark-up, plus costs incurred in terminating such work, such as costs of demobilizing the plant and administrative costs. Cajun has already paid SWECO for these costs.

SWECO argues that the third sentence of Schedule IV's introductory paragraph and the heading of the second column ("% of Contract Price Due") do not designate the amounts listed as maximum amounts only. According to SWECO, the contracts contain no other formula for computing amounts due. Schedule IV in the contract for the condenser lists that 100% of the contract price is due if the contract is terminated after twenty-one months, and the contract for the heaters lists that 100% of the contract price is due if the contract is terminated after seventeen months. SWECO asserts that it should receive 100% of each contract price because Cajun terminated these contracts after four years.

Louisiana law requires that each provision in a contract be interpreted in the light of other provisions so that each is given the meaning suggested by the contract as a whole. *See* La.Civ.Code art. 2050. We think the Schedule IV paragraph as a whole suggests that cancellation charges should equal the costs actually incurred by SWECO, but if those costs are higher than the percentage of the contract price listed in the second column, the percentage listed in Schedule IV places a ceiling on the amount due to SWECO. This conclusion not only gives effect to the word "maximum" in the first sentence of the paragraph, which clearly implies a ceiling, but also allows for the paragraph to be read consistently with section 5(m) of the contracts. SWECO's interpretation would make section 5(m)'s language, "with respect to terminated work performed prior to termination plus reasonable charges incurred in terminating such work," superfluous. If amounts due were to be established by Schedule IV, section 5(m) would have referenced it, or at the very least, would not have included this final prepositional phrase. If the prepositional phrase was absent, it might be reasonable to assume that amounts due were to be calculated by looking to Schedule IV. As it stands, however, the phrase alone provides for a method of calculation, and it does not clearly or unambiguously refer to Schedule IV as an integral part of that calculation. The third sentence of the paragraph simply explains that the level of the ceiling depends upon when the contract is terminated. Therefore, we agree with the district court's holding that SWECO is not entitled to the full contract price as termination charges.

AFFIRMED.