CHILTON INSURANCE COMPANY,
Appellant,

v.

PATE & PATE ENTERPRISES, INC.
and Mid–Continent Casualty
Company, Appellees.

No. 04–94–00028–CV.

Court of Appeals of Texas,
San Antonio.

Sept. 11, 1996.

Rehearing Overruled Sept. 11, 1996.

Second Rehearing Overruled Oct. 2, 1996.

878

Keith A. Langley, Robert M. Fitzgerald, Langley & Branch, P.C., Dallas, Andrew L. Kerr, Zachary B. Aoki, Jenkins & Gilchrist, Groce, Locke & Hebdon, P.C., San Antonio, for appellant.

Ricardo G. Cedillo, Susan G. Lozano, Davis, Adami & Cedillo, Inc., David Lopez, Associate Professional of Law, St. Mary's Law School, San Antonio, for appellees.

Before CHAPA, C.J., and STONE and GREEN, JJ.

GREEN, Justice.

Both the appellant's and the appellee's motions for rehearing are denied. The original opinion of the Court issued March 20, 1996 is withdrawn and the following is substituted in its place.

This is a construction case. A subcontractor on a public works project appeals from a judgment rendered against it in favor of the general contractor. The subcontractor claims that it is entitled to a net money judgment against the general contractor based upon a judicially admitted credit for work done in an amount exceeding the amount of damages the jury found that the subcontractor caused to the general contractor. The general contractor denies that it made the alleged judicial admission, but counters that if it did, the subcontractor's breach of contract bars its right of recovery. We hold that because it treated the contract as continuing in spite of the subcontractor's breach, the general contractor was deprived of its excuse for non-performance. The subcontractor was therefore entitled to the legal benefits of the judicially admitted credit. Accordingly, we affirm in part, reverse and render in part, and reverse and remand in part.

Pate & Pate Enterprises, Inc. ("Pate") was the general contractor for the construction of a storm drainage and street project ("the Project") for the City of San Antonio ("the City"). Pursuant to the state McGregor Act,[1] Pate, as principal, was required to provide a payment bond to the City to secure payment to those who furnished labor and materials on the job. Mid–Continent Casualty Company ("Mid–Continent") acted as surety on the bond. Caliber Construction, Inc. ("Caliber") was one of the subcontractors on the job. Caliber was required under its subcontract with Pate to provide payment and performance bonds. Chilton Insurance Company ("Chilton") was the surety on Caliber's performance bond. When Caliber defaulted and was unable to complete performance of its obligation under the subcontract, Chilton was called upon to honor its bond. Chilton thereupon entered into a "Takeover Agreement" with Pate whereby Chilton agreed to complete the work as provided in the Caliber subcontract, and Pate agreed to pay Chilton in accordance with the terms of the subcontract.

Because of delays and other problems allegedly caused by Chilton's performance, Pate withheld payments to Chilton even though Chilton continued to perform and even though Pate received progress payments from the City based upon Chilton's continuing work on the Project. When the Project was completed, Pate acknowledged that Chilton was entitled to a credit in the amount of $593,026.96 because of its work, but claimed that Pate had been damaged because of Chilton's poor performance and demanded reimbursement for the damages.

Chilton filed suit, claiming damages for breach of contract, and further asserted quantum meruit and McGregor Act theories of recovery. Pate counterclaimed, seeking recovery of its damages due to Chilton's alleged breach of contract, and additionally asserted claims for breach of warranty and for violation of the Texas Deceptive Trade Practices–Consumer Protection Act ("DTPA").[2] Chilton's quantum meruit claim was thrown out prior to trial, by summary judgment; the remaining claims were tried to a jury.

## JUDICIAL ADMISSION

In its first point of error, Chilton contends that the trial court erred in denying Chilton a judgment because Pate and Mid–Continent (sometimes jointly referred to hereafter as appellees) judicially admitted liability and damages to Chilton in the amount of $593,026.96. Chilton contends that this amount exceeded the amount of Pate's damages as found by the jury and, thus, Chilton is entitled to a judgment against appellees for the excess. *See* Tex.R.Civ.P. 302.

■ A judicial admission occurs when an assertion of fact is conclusively established in live pleadings, making the introduction of other pleadings or evidence unnecessary. *Houston First Am. Sav. v. Musick,* 650 S.W.2d 764, 767 (Tex.1983). A true judicial admission is a formal waiver of proof usually found in pleadings or the stipulations of the parties. *Mendoza v. Fidelity & Guar. Ins. Underwriters, Inc.,* 606 S.W.2d 692, 694 (Tex. 1980). "The vital feature of a judicial admission is its conclusiveness on the party making it. It not only relieves his adversary from making proof of the fact admitted but also bars the party himself from disputing it." *Gevinson v. Manhattan Constr. Co. of Okla.,* 449 S.W.2d 458, 466 (Tex.1969).

■ The alleged judicial admission here occurs in appellees' live trial pleadings, where it is alleged that:

As a proximate result of both Caliber's conduct before its default and Chilton's actions after Caliber's default, Pate and

---

1. Tex.Rev.Civ.Stat.Ann. art. 5160 (Vernon 1987), *repealed by* Act of May 22, 1993, 73rd Leg., R.S., ch. 268, § 46(1), 1993 Tex.Gen.Laws 583, 986 (current version at Tex.Gov't Code Ann. § 2253.001, *et seq.* (Vernon Supp.1996)).

2. Tex.Bus. & Com.Code Ann. § 17.46, *et seq.* (Vernon 1987 & Supp.1996).

Mid–Continent have suffered actual and consequential damages of at least $1,707,020.60. Pate and Mid–Continent would otherwise owe approximately $593,026.96 in funds which would have been paid to Chilton, but for Caliber's and Chilton's actions herein set forth. *Pate and Mid–Continent acknowledge a credit on Chilton's account in the sum of $593,026.96 against the actual damages owed by Chilton to Pate and Mid–Continent.* (italics supplied).

Taken in context with the entire pleading, the statement clearly, deliberately, and unequivocally concedes that appellees owe Chilton the amount of $593,026.96. There is no possibility of mistake. *See United States Fidelity & Guar. Co. v. Carr,* 242 S.W.2d 224, 229 (Tex.Civ.App.—San Antonio 1951, writ ref'd). Indeed, the character of the statement as a judicial admission was specifically mentioned during trial—the attorney for Chilton read the statement to the jury from appellees' pleadings without objection.[3] Moreover, during the charge conference, the matter was again discussed and it was reiterated that Chilton was entitled to credit for $593,026.96.[4]

Appellees argue strenuously that the statement in their pleading is not conclusive and does not rise to the level of a judicial admission. Pate contends the acknowledgement of the amount due Chilton is solely recognition of a credit on Chilton's account against the amount of damages due Pate from Chilton, and nothing more. Pate insists the alleged admission must be read in the context of the remainder of the pleading and, when this is done, it is clear that the concession applies only in the event that appellees prevail on their claims. Pate's argument is unconvincing. It is not within the purview of a party to limit the purpose for which they admit facts. The fact is admitted or it is not. Characterizing the monies owed as a credit against damages owed by Chilton to Pate does not transfigure Pate's statement in their live pleadings, and open court, into something other than what it was—a "judicial admission."

Appellees contend there is no liability finding in favor of Chilton and, thus, the "admission" is immaterial. However, by its very nature, a judicial admission relieves the adverse party of the burden of having to prove what has been admitted. *Gevinson,*

---

3. During the trial, the following exchange occurred in the presence of the jury:
 [Counsel for Chilton]:

 ... At this time we would offer as a judicial admission a portion of the live pleading of the counterclaim of these defendants, which is the Fifth Amended Counterclaim, on Page 22, Paragraph—Roman Numeral Section XII and then Paragraph 2.

 [Court]: I'm with you.
 [Counsel for Chilton]: Your Honor, what we would offer would be the—in Roman Numeral XII and, Your Honor, I have a copy of this. Under damages Roman Numeral XII, Paragraph 2, the second sentence is what we would like to offer at this time.
 [Counsel for Pate and Mid–Continent]: No, Judge, I'd like the entire paragraph read, not just the second sentence.
 [Counsel for Chilton]: Your Honor, that's fine.
 [Court]: All right. You may proceed.
 [Counsel for Chilton]: Your Honor, so that I'm clear on this for the record, what I'm doing is I am asking to be allowed to read this into evidence as a judicial admission. I'm not offering it as an exhibit at this time.

 [Court]: Correct.

 (Counsel for Chilton then read language from appellees' pleadings, containing the alleged judicial admission, to the jury.)

 [Counsel for Pate and Mid–Continent]: I've got no problem with that, Your Honor.

4. At the charge conference, the following exchange took place:
 [Counsel for Chilton]: Judge, I don't think that there's any uncertainty there as to what they say. They say they owe us the credit against the actual damages, and so if they don't have any actual damages and the jury returns a zero, we get 593, no matter what.
 [Counsel for Pate and Mid–Continent]: Well, no one's ...
 [Court]: No, there's no ...
 [Counsel for Pate and Mid–Continent]: No one's arguing with you about that.
 [Court]: Okay. You're going to get 593,026.96. They prevail, whatever it is.

449 S.W.2d at 466. We hold that the statement in appellees' pleading is clear and unequivocal and has the effect of relieving Chilton of having to prove appellees' liability and, consequently, Pate's admission has established Chilton's right to recover on its claim in, at least, the amount of $593,026.96.

Based on the foregoing, it was unnecessary to submit jury questions one through four because the issue of Pate's liability had been conclusively established by Pate's own admission. *See Dobbins v. Redden,* 759 S.W.2d 477, 480 (Tex.App.—San Antonio 1988), *aff'd as modified,* 785 S.W.2d 377 (Tex.1990). The answers to the first four jury questions will be disregarded to the degree they are contrary to a fact established as a matter of law—Pate is liable to Chilton. *See Long v. Tascosa Nat'l Bank of Amarillo,* 678 S.W.2d 699, 705 (Tex.App.—Amarillo 1984, no writ). Chilton's point of error number one is sustained.

## DISREGARDING JURY ANSWERS

Chilton's second point of error complains the trial court erred by disregarding the jury's answer to question number six[5] wherein the jury responded that Chilton was entitled to recover a total of $614,157.58 under the Mid–Continent payment bond against Mid–Continent and Pate. Pate counters that the answer to question six was immaterial in view of the jury's other answers excusing Pate's non-performance due to Chilton's breach. However, as noted earlier, Pate's liability has been established as a matter of law by its own judicial admission. Therefore, whether the jury believes Pate's non-perfor-

mance was excused is of no consequence, and the answer to the question establishing the amount to which Chilton is entitled, commonsensically, cannot be immaterial.

Pate argues, and we agree, that the McGregor Act does not create an independent entitlement to receive payment.[6] *See* Tex.Gov't Code Ann. § 2253.001 *et seq.* (Vernon Supp.1996). However, we do not agree with Pate's seeming assertion that acceptance of Chilton's contention—the answer to question six should not have been ignored—would somehow enable claimants, such as Chilton, to receive payment under a McGregor Act bond by simply complying with the notice requirements mandated in the Act. Chilton is not, as Pate argues, seeking payment solely based on compliance with the McGregor Act notice specifications. Rather, Chilton is endeavoring to obtain payment for labor and materials, which the evidence showed and the jury found, Chilton had supplied Pate in satisfaction of the Caliber subcontract and the Takeover Agreement. It is disingenuous, at best, for Pate to insist then, as it did, that Chilton, although allegedly in material breach of contract, must continue performing under the contract and to claim now that Chilton is seeking payment based exclusively on compliance with the McGregor Act notice criteria.

Based on the content of question six, the accompanying jury instruction, and the jury's answer to question six, it is apparent the jury believed that (1) Pate was liable to Chilton; (2) in the amount of $614,157.58; and (3) that Chilton had complied with the McGregor Act as a precondition to recovery under the pay-

---

5. Jury question number six asked:
 What sum of money, if any, is Chilton entitled to recover under the Mid–Continent Payment Bond against Pate & Pate and Mid–Continent?

6. The legislative purpose of article 5160, the McGregor Act, (now Tex.Gov't Code Ann. § 2253.001 *et seq.* (Vernon Supp.1996)) is to protect claimants who furnish labor and materials in the construction of public works, since no lien can exist against public works, and to provide a simple and direct method of giving notice and perfecting such claims. *City of LaPorte v. Taylor,* 836 S.W.2d 829, 832 (Tex.App.—Houston

[1st Dist.] 1992, no writ). Article 5160 is highly remedial in nature and courts should construe it liberally to accomplish its purposes. *Id.* at 832. Admittedly, the Act does not create an entitlement to payment, rather, it provides a mechanism to ensure that once labor and materials have been provided to a contractor or subcontractor on a public works project, pursuant to an agreement between the contractor or subcontractor and the labor or material provider, that the provider is assured of receiving payment. *J.W.D., Inc. v. Federal Ins. Co.,* 806 S.W.2d 327, 329 (Tex.App.—Austin 1991, no writ).

ment bond for labor and materials supplied to Pate. Pate persists that question six was included, not to establish an amount due Chilton, but solely to determine if Chilton had sufficiently complied with the timing and notice requirements of the McGregor Act to invoke the payment guarantees afforded public works suppliers. However, were this to be believed, it seems logical that the proper question would have addressed that subject directly in a "Yes" or "No" format (*e.g.* "Did Chilton comply with the timing and notice requirements of the McGregor Act?"). Neither party objected to the form or substance of question six as it was submitted to the jury.

We find the answer to question six was not immaterial and, hence, the trial court erred in disregarding same. Accordingly, Chilton's second point of error is sustained.

Pate next contends that Chilton is not a proper McGregor Act claimant, arguing that Chilton did not provide labor and materials itself, but simply provided the funding to complete the project. However, by virtue of the Takeover Agreement between Chilton and Pate, Chilton obligated itself to complete the Project according to the terms of Caliber's original subcontract, whether by performing the obligations itself or through an agent.

■ Pate would have this Court engraft a requirement on the statute decreeing that a proper McGregor Act claimant may not provide labor or materials through an agent but must actually provide the labor and material itself. This we decline to do. A McGregor Act payment bond, by its own terms, is designed to protect those who supply labor and material. TEX.GOV'T CODE ANN. § 2253.021(c) (Vernon Supp.1996). Nowhere in the statute is a contractor precluded from providing labor or material through an agent.

The cases on which Pate relies to support the premise that Chilton does not qualify for McGregor Act protection are easily distinguishable from the facts at hand. *See Hess & Skinner Eng'g Co. v. Turney,* 110 Tex. 148,

216 S.W. 621, 623 (1919) (bank funding government construction project not protected by contractor's payment bond); *see also Trinity Universal Ins. Co. v. Ponsford Bros.,* 423 S.W.2d 571, 575 (Tex.1968) (contractor advancing money to subcontractor for labor and material not entitled to statutory lien); *Massachusetts Bonding & Ins. Co. v. Farmers & Merchants' State Bank,* 139 Tex. 310, 162 S.W.2d 657, 661 (Tex.1942) (banks that merely lend money to contractor not intended beneficiaries of McGregor Act); *Verschoyle v. Holifield,* 132 Tex. 516, 123 S.W.2d 878 (1939) (those who lend money to contractors to provide labor and material not within protective ambit of statutory liens and bonds). In each of the foregoing cases, the claimant was denied statutory lien or bond protection solely in the capacity of lender. None were denied protection in the role of contractor or subcontractor. Pate's contention that Chilton is not a proper McGregor Act claimant is without merit.

## WAIVER OF EXCUSE FOR NON-PERFORMANCE

In point of error number three, Chilton complains the evidence was legally and factually insufficient to support the jury findings in answer to questions two and four that Pate's breach of contract was excused and, thus, the trial court erred by rendering a take-nothing judgment against Chilton based on those findings. The critical question is whether Pate waived its excuse for non-performance by treating the contract as continuing despite Chilton's alleged material breach and supposed misrepresentation.

■ It is clear that "[i]f after a party breaches a contract, the other party continues to insist on performance on the part of the party in default, the previous breach constitutes no excuse for nonperformance on the part of the party not in default and the contract continues in force for the benefit of both parties." *Houston Belt & Terminal Ry. v. J. Weingarten, Inc.,* 421 S.W.2d 431, 435 (Tex.Civ.App.—Houston [1st Dist.] 1967, writ ref'd n.r.e.). Where one party material-

ly breaches a contract, the non-breaching party is forced to elect between two courses of action—continuing performance or ceasing performance. *Western Irrigation Co. v. Reeves County Land Co.*, 233 S.W.2d 599, 602 (Tex.Civ.App.—El Paso 1950, no writ). Treating a contract as continuing, after a breach, deprives the non-breaching party of any excuse for terminating their own performance. *Id.* Seeking to recover damages under the contract, as Pate did, is evidence that Pate considered the contract as continuing. *See Cox, Colton, Stoner, Starr and Co., P.C. v. Deloitte, Haskins, and Sells*, 672 S.W.2d 282, 286–87 (Tex.App.—El Paso 1984, no writ) (seeking to benefit from contract operates as conclusive choice depriving party of excuse for non-performance). Pate, by its own words, admits it "did not seek to declare the contract terminated, but rather operated within the terms of the contract and performed its obligations under such contract."

■■■ Pate argues, without citation to authority, that section 5.1(e) of the subcontract shifted the burden of election of remedies to Chilton at the point in time that Pate first withheld a progress payment. By characterizing the issue in this fashion Pate misapprehends the operation of the election doctrine. Chilton had no election to make when Pate withheld progress payments because Pate was clearly permitted by the subcontract to do just that. An election does not arise until the other party materially breaches the contract. Pate's failure to comply with the subcontract did not occur at the time it withheld progress payments. If a breach occurred, it was when Pate withheld final payment after the Project was accepted by the City.

Here, at the point in time that Pate concluded Chilton had materially breached the contract, Pate was forced to choose one of two mutually exclusive courses of action. Pate must either discontinue its own performance, rescind the contract, and sue for material breach, or continue its performance and lose the other party's material breach as an excuse for its own non-performance. *See*

*Western Irrigation Co.*, 233 S.W.2d at 602 (treating the contract as continuing does not deprive the non-breaching party of its cause of action for breach; it only divests that party of its excuse for not performing). By its actions, Pate chose the latter. Because Pate treated the contract as continuing after Chilton's material breach, Pate forfeited any excuse for its own breach.

■■■ Pate also argues that its non-performance is excused because a misrepresentation by Chilton induced Pate to enter into the Takeover Agreement. However, the case cited by Pate does not stand for that premise. *See Schroeder v. Texas Iron Works, Inc.*, 769 S.W.2d 625 (Tex.App.—Corpus Christi 1989), *aff'd*, 813 S.W.2d 483 (Tex. 1991). Although *Schroeder* speaks to the elements of equitable estoppel, it will not sustain the theory that such misrepresentation excuses the other party's non-performance. A misrepresentation which induces a party to enter a contract, while making the contract voidable at the instance of the innocent party, does not excuse non-performance. Nonetheless, even if a misrepresentation was sufficient to excuse Pate's non-performance, we do not believe that the source of Pate's excuse bears on whether it is waived. By treating the contract as continuing after Chilton's material breach, Pate forfeited any excuse for its own non-performance.

The evidence establishes, as a matter of law, that Pate's failure to comply with the Takeover Agreement and the Caliber Subcontract was not excused. Point of error three is sustained.

## QUANTUM MERUIT

Chilton complains, in point of error four, that the trial court erred by granting partial summary judgment in favor of Pate on Chilton's quantum meruit claim. In its motion for summary judgment, Pate's only ground for summary judgment contended that existence of an express agreement covering the work Chilton was obligated to perform precluded an action for recovery in quantum meruit.

 "The motion for summary judgment shall state the specific grounds therefor." TEX.R.CIV.P. 166a(c). "A motion [for summary judgment] must stand or fall on the grounds expressly presented in the motion." *McConnell v. Southside Indep. Sch. Dist.,* 858 S.W.2d 337, 341 (Tex.1993). On appeal, a summary judgment may be upheld only on the grounds stated in the motion. *Roberts v. Southwest Texas Methodist Hosp.,* 811 S.W.2d 141, 144 (Tex.App.—San Antonio 1991, writ denied). Therefore, in the instant case, if recovery in quantum meruit is not precluded by an express agreement covering the same work, Pate loses the partial summary judgment in its favor.

 As a general rule, a party seeking to recover the equivalent value of services and materials provided to another can only recover in quantum meruit if there is no express contract for those services and materials. *Truly v. Austin,* 744 S.W.2d 934, 936 (Tex.1988). However, an exception exists in construction cases, thereby permitting a breaching plaintiff to recover in quantum meruit for the value of services and materials rendered, less any damage suffered by the defendant. *Truly,* 744 S.W.2d at 937. The key to the plaintiff's right to recover in such cases is the defendant's acceptance, use, and enjoyment of the benefits conferred by the plaintiff. *Id.* A defendant cannot accept the benefit of another's performance and then maintain that the other party is precluded from recovering fair value for the benefit it conferred.

 Even assuming that the materials and services for which Chilton seeks payment are covered by an express agreement, the construction exception to the quantum meruit rule mandates that Chilton be provided the opportunity to prove an entitlement to a quantum meruit recovery as an alternative to a contract recovery. However, should Chilton recover in quantum meruit, that recovery would be against Pate only. Mid–Continent's liability is solely contractual in nature and does not extend to any equitable remedies. We find the trial judge erred in granting partial summary judgment to Pate. Chilton's fourth point of error is sustained.

## DTPA

Chilton's points of error nine and ten assert that the evidence is legally and factually insufficient to support jury findings that Chilton breached an express or implied warranty or that it engaged in any false, deceptive, or misleading act or practice.

### False, Deceptive, or Misleading Acts or Practices

Chilton's arguments in support of these points of error fall into three general categories. First, this dispute is about contract interpretation and, therefore, does not constitute a DTPA violation. Second, failure to perform a contract is not an actionable misrepresentation rising to the level of a DTPA violation. Third, the evidence is insufficient to support a finding that Chilton breached any express or implied warranties.

 Chilton correctly argues that disputes relating to contract performance based on differing contract interpretations do not rise to the level of DTPA violations. *See Quitta v. Fossati,* 808 S.W.2d 636, 644 (Tex. App.—Corpus Christi 1991, writ denied). In such cases, traditional contract principles apply. *Id.* Both parties agree that conduct must involve more than a mere breach of contract in order to rise to the level of a false, misleading or deceptive act sufficient to invoke the rights and remedies of the DTPA. *See Ashford Dev., Inc. v. USLife Real Estate Servs. Corp.,* 661 S.W.2d 933, 935 (Tex.1983). By itself, failure to perform a promise in an agreement does not constitute a misrepresentation nor does such failure constitute an unconscionable act as those terms are defined in the DTPA. *See Crawford v. Ace Sign, Inc.,* 917 S.W.2d 12, 14–15 (Tex.1996) (reaffirming earlier conclusion that failure to perform, by itself, is not a misrepresentation); *Gulf States Underwriters of Louisiana, Inc. v. Wilson,* 753 S.W.2d 422, 429 (Tex.App.—Beaumont 1988, writ denied)

(breach of contract, without more, is not an unconscionable act for DTPA purposes or under article 21.21 of the Insurance Code); *Holloway v. Dannenmaier,* 581 S.W.2d 765, 767 (Tex.Civ.App.—Fort Worth 1979, writ dism'd) (failure to perform a promise, alone, does not constitute a misrepresentation violative of the DTPA).

█ The determination of whether a breach of contract rises to the level of a misrepresentation sufficient to trigger the DTPA is a fact-driven inquiry. After the facts have been ascertained, whether they constitute a DTPA-level misrepresentation is a question of law. *See, e.g., La Sara Grain Co. v. First Nat'l Bank of Mercedes,* 673 S.W.2d 558, 565–66 (Tex.1984) (after examining evidence court concluded that bank's action was not a deceptive trade practice); *West Anderson Plaza v. Feyznia,* 876 S.W.2d 528, 534–35 (Tex.App.—Austin 1994, no writ) (court concluded that no cause of action existed under the facts); *see also Helms v. Southwestern Bell Tel. Co.,* 794 F.2d 188, 191 (5th Cir.1986) (concluding that acts of defendant amounted to no more than "simple breach of contract").

█ In this case, the purpose of the Takeover Agreement was for Chilton to complete the Project in accordance with the terms of the Caliber subcontract. In this context, an examination of the record fails to demonstrate how or why Chilton's alleged failure to perform should be deemed to rise above a mere breach of contract insofar as it pertains to any false, deceptive, misleading or unfair act or practice. Consequently, we find that Chilton's acts, omissions, and representations do not constitute misrepresentations or unconscionable conduct sufficient to invoke the DTPA. Point of error ten is sustained.

### Breach of Warranty

█ Specific conduct, although not an actionable misrepresentation under the DTPA, may nevertheless constitute a breach of contract or breach of warranty. Therefore, we must resolve whether Chilton's conduct amounted to a breach of warranty, a breach of contract or nothing at all. This decision is crucial because each is a different cause of action with different remedies. *See Southwestern Bell Tel. Co. v. FDP Corp.,* 811 S.W.2d 572, 576 (Tex.1991). Such a determination is also important because a breach of warranty may form the basis for DTPA liability. *See Enterprise–Laredo Assoc. v. Hachar's, Inc.,* 839 S.W.2d 822, 830 (Tex.App.— San Antonio), *writ denied per curiam,* 843 S.W.2d 476 (Tex.1992).

█ When a party fails to deliver as promised, a breach of contract occurs. *Cf. Southwestern Bell Tel. Co.,* 811 S.W.2d at 576. Conversely, when a seller delivers nonconforming goods, it is a breach of warranty. *Id.* Under the Uniform Commercial Code ("UCC"), breach of contract damages are available for failure to perform, but not for delivery of non-conforming goods. *Brooks, Tarlton, Gilbert, Douglas & Kressler v. United States Fire Ins. Co.,* 832 F.2d 1358, 1375 (5th Cir.1987) (describing different remedies available under TEX.BUS. & COM.CODE ANN. § 1.101 et seq. (Vernon 1987) [Uniform Commercial Code] for breach of contract versus breach of warranty, and observing that each is addressed in separate sections). The Fifth Circuit held that the aforementioned contrast between contract terms and warranties is imported into the DTPA from the UCC intact. *See id.* at 1375. The same rationale applies whether the contract is for services or goods. *See Southwestern Bell Tel. Co.,* 811 S.W.2d at 576.

█ The DTPA fails to define its use of the term "warranty." *See La Sara Grain Co.,* 673 S.W.2d at 565. Accordingly, we apply the ordinary meaning of the term. Generally, a warranty describes the "character, quality, or title" of that which is being sold and "by which seller promises or undertakes to insure that certain facts are or shall be as he then represents them." BLACK'S LAW DICTIONARY 1586 (6th ed. 1990). An

express warranty[7] is a definitive affirmation of fact or promise which becomes part of the basis for the bargain and upon which the parties rely. *See Morris v. Adolph Coors Co.,* 735 S.W.2d 578, 587 (Tex.App.—Fort Worth 1987, writ ref'd n.r.e.). Implied warranties[8] are based in tort law and are judicially interjected into agreements whenever necessitated by public policy to ensure that parties receive that for which they bargained. *See Melody Home Mfg. Co. v. Barnes,* 741 S.W.2d 349, 353 (Tex.1987); *see also Parkway Co. v. Woodruff,* 901 S.W.2d 434, 438 (Tex.1995). A contract term identifies what is being sold; warranties describe the attributes, suitability for a particular purpose, and ownership of what is sold. *Cf. Donnelley Mktg. v. Lionel Sosa, Inc.,* 716 S.W.2d 598, 604 (Tex.App.—Corpus Christi 1986, no writ) (court held supplier's provision of wrong mailing list to advertiser was tantamount to no delivery at all and amounted to breach of contract).

■■■ Accordingly, for purposes of determining the existence of a warranty, the focus of the examination must be on that which is sold. In the sale of goods, the question is whether the goods delivered pursuant to the contract are in conformance with the statement or representation of the character, quality or title of the goods promised at the time of sale. Similarly, in the sale of services, the question is whether the services received conform to the character and quality of the services as promised. In short, it is the character and quality of the end product of the contract for goods or services that determines whether there has been a breach of warranty.

Pate's counterclaim asserts the existence of the following warranties:

a. The work would be of good quality; free from defects; and in conformance with the contract, and the conditions of the contract, plans, and specifications.

b. The work would be prosecuted timely, diligently, continuously, efficiently, and in a good and workmanlike manner.[9]

c. That the work performed would be fit for its ordinary purpose.

d. That the work would be completed as directed by Pate and agreed to by Caliber.

Pate's pleading goes on to allege that Chilton breached these "warranties" by failing to "timely and efficiently perform the work and clean up the project." It is clear that Chilton was contractually obligated to fulfill the promises contained in the subcontract for which Chilton assumed liability by virtue its performance bond and the Takeover Agreement—the language in Pate's counterclaim is practically identical to the words used in the subcontract. What is unclear is whether any of these promises amount to warranties.

■■■ We view the alleged "warranties" as basically fitting within two broad categories: (1) that the work, *when completed,* would comply with the job specifications (good quality, free from defects, conforming to the plans and specifications, fit for its purpose; *i.e.,* good and workmanlike performance), and (2) that the work would be performed in accordance with the time schedule contained in the Takeover Agreement (timely, diligently, continuously, efficiently, and as directed).

With respect to the first category, we note that Chilton's work was accepted by the own-

7. The Charge of the Court in the instant case defined an express warranty as "any affirmation of fact or promise made by Chilton that relates to the Project and becomes part of the basis for the bargain."

8. Jury question 19 asked whether Chilton failed to perform services in a good and workmanlike manner. The attendant instruction explained that a "good and workmanlike manner is that quality of work performed by one who has the knowledge, training, or experience necessary for

the successful practice of a trade or occupation and performed in a manner generally considered proficient by those capable of judging such work."

9. Although jury question 19 addresses breach of the implied warranty of "good and workmanlike" performance, it is unnecessary to determine whether there is such an implied warranty in this case because the express language of the subcontract agreement includes the "good and workmanlike" requirement.

er and Pate was paid for the work. No warranty claims are asserted here for the failure of Chilton's completed work to comply with the job specifications. Chilton's agreement to clean up the project is part of the job specification; it is clearly a contract term and not a warranty. A breach of that provision exposes Chilton to contract damages only.

As far as the second category is concerned, the promise of timely performance is contractual and is not a warranty. The contract specifies that "[s]ubcontractor shall fully complete the Work by 500 working days, or as directed by Contractor from time to time." Failure to complete the job within the allotted time amounts to a breach of contract, if anything, but could not trigger breach of warranty liability under the DTPA. Point of error nine is sustained.

Chilton's point of error eleven challenges the legal sufficiency of the evidence supporting the jury's finding that Chilton knowingly breached an express or implied warranty and knowingly engaged in false, misleading, or deceptive acts or practice. Because we have determined, as a matter of law, that Pate is not entitled to relief under the DTPA, it is unnecessary to examine the sufficiency of the evidence in that regard. Point of error eleven is sustained.

## DAMAGES

### Extended Home Office Overhead

■ Chilton's twelfth point of error maintains the trial court erred by including a damage award for extended home office expenses based on the "modified *Eichleay*" formula[10] because the evidence was legally and factually insufficient to justify such an award.

We have found no Texas cases authorizing the use of *Eichleay* to calculate damages.

Nevertheless, for reasons to follow, we find it unnecessary to decide the propriety of using the *Eichleay* formula or any of its modified versions to calculate overhead damages. Even if *Eichleay* were deemed appropriate, Pate has not met its burden necessary to invoke the use of such a formula.

■ Courts that have addressed home office overhead as an element of damages segregate overhead costs into two types: (1) extended home office overhead; and (2) unabsorbed home office overhead. *See Southwestern Eng'g Co. v. Cajun Elec. Power Co-op.*, 915 F.2d 972, 978 (5th Cir.1990); *Capital Elec. Co. v. United States,* 729 F.2d 743, 745 n. 3 (Fed.Cir.1984). "Extended overhead" is defined as those additional costs incurred when completion of a construction job is prolonged beyond its scheduled completion. *Capital Elec. Co.,* 729 F.2d at 745 n. 3. "Unabsorbed overhead" includes those expenses, generally in a manufacturing context, allocated to a fixed period of production time, that must be absorbed by fewer jobs because a job designated for that given period has been delayed. *Southwestern Eng'g Co.,* 915 F.2d at 978. According to Pate's pleadings and the jury questions submitted, the overhead expenses Pate sought to recover are clearly "extended home office overhead" damages.

Preliminary to the use of the *Eichleay* formula to ascertain the extent of any overhead damages, Pate was required to prove that it incurred additional overhead costs directly resulting from construction delays caused by Chilton. *See Guy James Constr. Co. v. Trinity Indus., Inc.,* 644 F.2d 525, 533 (5th Cir.1981). The additional expenses must be over and above normally incurred fixed expenses *Id.* Further, Pate was required to demonstrate that it would have obtained other jobs to absorb the extra overhead but for the delay by Chilton. *See id.*

■ Reviewing only the evidence and inferences that tend to support the verdict,

---

**10.** The *"Eichleay"* formula refers to a method whereby a contractor may calculate damages arising from construction delay. *Daly Constr., Inc. v. Garrett,* 5 F.3d 520, 522 (Fed.Cir.1993). This formula calculates the daily rate of overhead allocable to a particular contract. *Eichleay* *Corp.,* ASBCA No. 5183, 60–2 B.C.A. (C.C.H.) p2688, *on reconsideration,* 61–1 B.C.A. (C.C.H.) p2894 (1961). The overhead-per-day rate is multiplied by the number of days the job was extended to determine total overhead damages attributable to the delay.

there is "some evidence" in the record that Chilton's delay precipitated additional overhead expenses. Steve Pate, Pate's company president, testified that the delay and disruption in performance of the contract by Chilton resulted in "more overhead." Also, Steve Pate testified that had the Project been completed, Pate would have been doing other jobs and that the home office overhead would have been expensed to those jobs. "Some evidence" is sufficient to overcome a legal sufficiency point of error.

 However, to resolve the factual sufficiency point, this Court examines all the evidence and reverses only if the finding is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1986). As noted earlier, Steve Pate testified that Pate incurred "more overhead" because the Project took "much longer than anticipated." But later, while recapping the damages being sought, the following exchange occurred between Chilton's counsel and Steve Pate:

Q Okay. And the *Eichleay* formula, you're not pointing to any specific items that this job cost you more because it supposedly was delayed. You're giving us a formula, right?

A I think they just used the best way they knew how. It was to take a formula to, you know, to allocate the overhead.

The import of the testimony was that Pate could not identify any specific additional costs incurred because of the delay. Rather, Pate admitted that the damage claim was the product of a mathematic formula derived from normal overhead costs. Pate's expert also acknowledged that she could not state that Pate's home office overhead expenses increased due to the Project delay. Pate's expert testified further that Pate, in keeping with industry practice, did not maintain its records in such a manner as to identify any added overhead expense caused by a construction delay; hence, the use of the *Eichleay* formula to calculate the damages.

Despite a 5000–plus page statement of facts and volumes of exhibits, Pate directed this Court to nothing more than Steve Pate's statements that the company incurred "more overhead" and that it could have been doing other jobs had it not been for Chilton's delay. After reviewing the record, we find little to substantiate Pate's claim that it incurred overhead expenses beyond those costs that would have accrued whether the Project was delayed or not. We find the evidence supporting a finding of added overhead expense necessary to trigger the use of the *Eichleay* formula so against the great weight and preponderance of the evidence as to be manifestly unjust. Because such finding is factually insufficient, point of error twelve is sustained and the award of extended home office overhead damages is vacated and remanded.

### Clean-up Costs

Chilton's fourteenth point of error asserts the trial court erred by including site cleanup costs in the damage award because the evidence was legally and factually insufficient to support the jury's finding in that regard. Chilton contends that Pate did not give proper *written* notice as required by the contract of its intention to do the clean up work itself and, therefore, did not fulfill the condition precedent necessary to invoke its contractual right to charge back clean-up costs. Pate admits that it did not give written notice, contending that the contract only required "notice," not "written notice." Additionally, Pate argues that charging clean-up costs back to Chilton as an expense item is but one of two alternative methods whereby Pate might be compensated for Chilton's failure to perform. Pate maintains that while failing to meet the condition precedent of written notice may prevent it from expensing clean-up costs to Chilton, it does not preclude Pate from recovering damages for Chilton's breach of contract.

 We agree with Pate. Chilton, by signing the Takeover Agreement, assumed an absolute contractual duty to "clean up and remove from the Project site, as directed by

Contractor, all rubbish, debris and surplus materials which accumulate...." The duty to perform site clean up is not conditioned on notice of any kind. The only condition pertinent to the clean-up provision is the one which requires Pate to give "written" notice before it can invoke its right to expense clean-up costs to Chilton. It does not condition Pate's right to recover damages.

We conclude that because Chilton breached an unconditional duty to clean up the Project site, Pate is entitled to recover damages. Chilton's fourteenth point of error is overruled.

### *"Look-Back" Rule*

In point of error thirteen, Chilton complains the trial court erred in granting judgment for damages to Pate based on the "look-back" rule because the evidence supporting such an award was legally and factually insufficient. By agreement of the parties, Pate's claim for "look-back" damages was tried to the court.

■■■ The term "look-back" refers to a tax rule codified in Internal Revenue Code section 460(b) that sets out the requirements for reporting income received from a long-term contract. Generally, a taxpayer must pay, or is entitled to receive, interest on the amount of tax liability deferred or accelerated based on the percentage of completion method of reporting income from a long-term contract. I.R.C. § 460(b) (1991); Treas.Reg. § 1.460–6(a)(1) (1991).

Pate claims that it was damaged in the amount of interest it would be forced to pay under section 460 on the amount of actual damages received as recompense for Chilton's breach. However, because we conclude, *infra,* that the net recovery of actual damages favors Chilton, Pate will not have additional income attributable to the contract for which interest would be due. Point of error thirteen is, therefore, sustained and the award of "look-back" damages is vacated.

### SET–OFFS

It must now be determined how the recovery due the parties is to be applied in light of the relative success of both litigants. Somewhat inconsistently with their argument that no judicial admission occurred, Pate does not complain that the trial court erred in applying the credit against the total damages found in favor of appellees; rather, they contend that the offset was properly applied by the trial court *after* all amounts due them (*i.e.,* damages, prejudgment interest, attorney's fees, and costs) were totalled up. Chilton disagrees and contends, alternatively, that one of two options is proper: either (1) add prejudgment interest, attorney's fees, and costs to the amounts due both parties first, and then determine the net recovery amount and to whom it is owed; or (2) offset actual damages first and then add prejudgment interest, attorney's fees, and costs to that result.

■■■ Rule 301 of the Texas Rules of Civil Procedure permits only one final judgment in any cause. TEX.R.CIV.P. 301. Where both the plaintiff and defendant are entitled to recover differing amounts from each other, the court is required to determine which party is entitled to the greater recovery and render judgment for that party in the amount of the excess. *See Willingham v. Hagerty,* 553 S.W.2d 137, 139–40 (Tex.Civ.App.—Amarillo 1977, no writ). Because prejudgment interest may begin to accrue at different times depending on when the damages become fixed,[11] the method used in *Acco Constructors v. National Steel Products,* where the court took the judgment amount due the party receiving the larger recovery, including prejudgment interest, and subtracted the counterclaim amount due the party receiving the lesser, including prejudgment interest, to arrive at a net recovery amount appears to be the most accurate. *Acco Constructors, Inc. v. National Steel Prods. Co.,* 733 S.W.2d 368, 371–72 (Tex. App.—Houston [14th Dist.] 1987, no writ).

11. *See Miner–Dederick Constr. Corp. v. Mid–County Rental Serv., Inc.,* 603 S.W.2d 193, 200 (Tex. 1980). "Prejudgment interest is recoverable as a matter of right when an ascertainable sum of money is determined to have been due and payable at a definite date prior to judgment." *Id.*

After determining the net damage recovery, the court in *Acco* determined the net attorney's fees due, including additional amounts for appeals. *Id.* at 371. Adding the difference between the judgment/counterclaim amounts due each of the parties, including prejudgment interest, to the net amount of attorney's fees due yields the total net recovery due. *Id.* at 371–72 & nn. 2–4.

## COSTS, ATTORNEY'S FEES, AND PRE-JUDGMENT INTEREST

### Costs

Chilton's points of error seven and seventeen complain that the trial court erred in awarding costs to Pate and in failing to award costs to Chilton. Chilton submits the proposition that because it demonstrated a right to recover more than Pate, final judgment should be rendered in its favor. And, such being the case Chilton, and not Pate, should recover its costs. We agree.

■ In suits involving claims and counterclaims, the party receiving the larger award is entitled to final judgment and recovery of its costs. *See* TEX.R.CIV.P. 302, 303; *Willingham*, 553 S.W.2d at 140. The procedural facts in the case at hand are similar to those in *Rio Grande Valley Sugar Growers, Inc. v. Campesi*, 580 S.W.2d 850, 866 (Tex.Civ.App.—Corpus Christi), *rev'd on other grounds*, 592 S.W.2d 340 (Tex.1979), to this extent. In our case, as in *Campesi*, the plaintiff brought suit, the defendant counterclaimed, and the plaintiff received the larger recovery. *Rio Grande Valley Sugar Growers, Inc.*, 580 S.W.2d at 865. Here, as there, because the plaintiff (*i.e.* Chilton) was "the party in whose favor final judgment [was] rendered" it is the party entitled to recover costs. TEX.R.CIV.P. 303. Chilton's points of error seven and seventeen are sustained.

### Attorney's Fees–Trial

Points of error five and fifteen challenge the trial court's failure to award attorney's fees to Chilton while awarding them to Pate.

In point of error five, Chilton asserts that the trial court erred by failing to award attorney's fees to Chilton because it recovered, or was entitled to recover, on its claims. Chilton maintains that it is authorized under the Civil Practice and Remedies Code and/or the McGregor Act to recover attorney's fees for successful prosecution of its claim. Pate counters that Chilton received no affirmative relief of any kind and, hence, is not qualified to receive attorney's fees. Pate insists that admitting it owed a "credit" to Chilton somehow yields a different result when it comes to determining attorney's fees than had a jury made an affirmative finding in Chilton's favor. It does not. As noted earlier, the distinction urged by Pate is non-existent. Admission of a fact by a party makes an affirmative finding of liability unnecessary. *Gevinson*, 449 S.W.2d at 466.

■ Section 38.001 of the Civil Practice and Remedies Code permits recovery of attorney's fees if the claim is for, among other things, services rendered, labor performed, material provided, or contracts—written or oral. TEX.CIV.PRAC. & REM.CODE ANN. § 38.001 (Vernon 1986). Alternatively, under the McGregor Act, the court may award reasonable attorney's fees in a proceeding to enforce a claim on a payment bond. TEX. GOV'T CODE ANN. § 2253.074 (Vernon Supp. 1996). Therefore, because Chilton is entitled to recover on its claim, it was error for the trial court to fail to award attorney's fees in accordance with the foregoing. Because point of error five is sustained, the issue of Chilton's attorney's fees must be remanded to the trial court for a factual determination of the amount.

Point of error fifteen complains that the trial court erred in awarding attorney's fees to Pate because the evidence was legally and factually insufficient to support such an award; Pate failed to segregate the fees between successful and unsuccessful claims; and the amount awarded was excessive. Pate claims attorney's fees based on the statutory authority of the Civil Practice and Remedies Code and the DTPA, and the con-

tractual authority of the subcontract agreement.

■ It is plain that a successful litigant is entitled to attorney's fees even though the entire amount awarded that party is offset by damages awarded to the opposing party. *See Matthews v. Candlewood Builders, Inc.,* 685 S.W.2d 649, 650 (Tex.1985). Nevertheless, Chilton raises a question concerning the necessity of segregating attorney's fees among the various claims. Chilton asserts that Pate is obligated to allocate the amounts it spent on attorney's fees between defending Chilton's claims, pursuing its tort claims, urging its contract claims and, presumably by extrapolation, the amount consumed by endeavoring to recover under the DTPA. Generally, a party is required to segregate fees between claims for which fees are recoverable and those for which they are not, and between successful and unsuccessful causes of action. *Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1, 10–11 (Tex.1991). However, it is also true that an exception to the segregation requirement arises when the attorney's fees incurred are rendered in connection with claims arising from the same transaction or occurrence and are "so interrelated that their 'prosecution or defense entails proof or denial of essentially the same facts.'" *Sterling,* 822 S.W.2d at 11 (citation omitted). After examining the record and considering the nature of the contract and DTPA claims, we conclude Pate's prosecution of either claim necessitated proof of essentially the same facts, as did Pate's defense against Chilton's claims. Thus, segregation of fees between the two causes of action is impractical, if not impossible.

■ Further, and most important in this case, attorney's fees must be reasonable and necessary, and bear some relationship to the amount recovered. *See Building Concepts, Inc. v. Duncan,* 667 S.W.2d 897, 904 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.). The court is authorized to look at the entire record of the case, the evidence presented on reasonableness of fees, the amount in controversy, the common knowledge of the

participants as lawyers and judges and, of particular weight in this case, the relative success of the parties on their causes of action and damage theories. TEX.DISCIPLINARY R.PROF.CONDUCT 1.04 (1990) *reprinted in* TEX.GOV'T CODE ANN., tit. 2, subtit. G app. (Vernon Supp.1996) (STATE BAR RULES art. X, § 9); *Building Concepts, Inc. v. Duncan,* 667 S.W.2d at 904. Based on this Court's disposition of the case, and the relief prayed for, we believe it is appropriate to remand the issue of Pate's attorney's fees to the trial court for a redetermination not inconsistent with this opinion. Point of error fifteen is sustained.

### Attorney's Fees–Appellate

■ Chilton argues in point of error sixteen that the trial court erred in awarding contingent appellate attorney's fees to Pate because Chilton, not Pate, was the successful party at trial and/or Chilton will eventually prevail on appeal. It is clear that the award of appellate attorney's fees to the trial court winner is appropriate, provided they are conditioned on ultimate appellate success. *CPS Int'l, Inc. v. Harris & Westmoreland,* 784 S.W.2d 538, 544 (Tex.App.—Texarkana 1990, no writ). Plainly, in view of our holdings in this cause, Pate has not been successful on appeal. Chilton's sixteenth point of error is sustained, and the award of contingent appellate attorney's fees to Pate is vacated.

### Prejudgment Interest

Chilton's points of error six and eight question the trial court's failure to award prejudgment interest to Chilton while at the same time complaining that the court awarded prejudgment interest to Pate erroneously. Pate counters that Chilton, by virtue of its assumption of the subcontract agreement, contracted for no interest on withheld payments or, alternatively, that Chilton recovered no damages which would permit the award of prejudgment interest.

■ In view of our earlier conclusions, the latter contention is without merit and

that subject will not be revisited. As to the former, Chilton did, indeed, contract for no interest on progress payments withheld under the subcontract. However, it is evident from the language of the agreement, specifically section 5.2 titled "Final Payment," that the parties did not contemplate Pate would or could withhold the funds forever, unless there was a complete failure to perform. That, by Pate's own admission, is not the circumstance here. Pate conceded that it was liable to Chilton. Pate conceded that it owed, and Chilton had earned, $593,026.96; the jury found the amount owed to be $614,157.58. Despite Pate's arguments, and although the McGregor Act does not explicitly provide for prejudgment interest, Texas cases support the award of interest in conjunction with a recovery under a McGregor Act claim. *See Sims v. William S. Baker, Inc.,* 568 S.W.2d 725, 731 (Tex.Civ.App.— Texarkana 1978, writ ref'd n.r.e.); *H. Richards Oil Co. v. W.S. Luckie, Inc.,* 391 S.W.2d 135, 140–41 (Tex.Civ.App.—Austin 1965, writ ref'd n.r.e.). Using the amount due under the Pate and Mid–Continent payment bond as determined by the jury to be the amount due and owing from Pate to Chilton, we conclude that because of the multiple claims, at the latest, the entire amount was due sixty days after the last claim was filed on January 23, 1989. TEX.GOV'T CODE ANN. § 2253.073 (Vernon Supp.1996). Therefore, Chilton is entitled to prejudgment interest running from March 25, 1989 until the date of judgment. Point of error six is sustained.

■ As noted earlier, prejudgment interest is recoverable as a matter of right when a specific amount of money is due a party at a specific time prior to judgment. *Miner–Dederick Constr. Corp.,* 603 S.W.2d at 200. Prejudgment interest serves as additional damages for the loss of use of money due a party between the time the damages are incurred and the date of judgment. *LaCoure v. LaCoure,* 820 S.W.2d 228, 237 (Tex.App.— El Paso 1991, writ denied).

■ Under other circumstances, being successful on at least some of its claims would entitle Pate to prejudgment interest on those amounts. However, the case before us is different than the usual case addressing the propriety of awarding prejudgment interest. Here, undisputed evidence shows that upon completion and acceptance of this Project, Pate was paid in full by the City. Thus, because Pate has withheld payment to Chilton since that time, and because Pate's damages are less than the amount it withheld from Chilton, Pate is not entitled to prejudgment interest. Accordingly, point of error eight is sustained.

## CONCLUSION

The judgment below is reversed, and it is rendered that Chilton recover from Pate and Mid–Continent, jointly and severally, the amount of $614,157.58, together with prejudgment interest from March 25, 1989, and attorneys' fees.

Judgment is further rendered that Pate is entitled to offset against Chilton's recovery the amount of $179,479.04 for backcharges, site cleanup, project delay, and disruption, together with attorneys' fees. Pate is also entitled to offset any extended home office overhead damages it is able to prove on remand. Pate takes nothing on its claims for "look-back" damages and additional damages under the DTPA. Pate is not entitled to prejudgment interest on its recovery of damages.

The cause is remanded to the trial court for retrial of the remaining fact issues concerning the amount of attorneys' fees to be awarded to the parties in light of the above, Pate's claim for extended home office overhead damages, and for entry of judgment consistent with this opinion. Costs of court shall be awarded to the party in whose favor a final judgment is rendered. TEX.R.CIV.P. 303.