# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-06-00655-CV

**Austin Traffic Signal Construction Co., L.P., d/b/a ATS Electrical Contractors;
Cajun Constructors, Inc.; Liberty Mutual Insurance Company;
and Fidelity and Guaranty Insurance Underwriters, Inc., Appellants**

**v.**

**Transdyn Controls, Inc., Appellee**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT
NO. D-1-GN-02-002371, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

This case involves a contract between an equipment supplier and an electrical subcontractor on a City of Austin construction project. Transdyn Controls, the equipment supplier, sued subcontractor Austin Traffic Signal Construction Co., L.P. ("ATS") for failing to pay for the equipment Transdyn had supplied for the construction project. Transdyn also sued Cajun Constructors, Inc., Liberty Mutual Insurance Company, and Fidelity and Guaranty Insurance Underwriters, Inc., alleging that they were responsible for Transdyn's damages because they had provided payment bonds on the project. ATS filed a counterclaim against Transdyn, asserting that Transdyn had breached the parties' equipment-supply contract by providing defective equipment and by failing to complete other obligations under the parties' contract. After a bench trial, the trial court rendered judgment in favor of Transdyn. In six issues, ATS asserts that the trial court erred by

(1) admitting certain witness testimony into evidence, (2) failing to award ATS an offset for training fees it had incurred as a result of Transdyn's breach, and (3) awarding "incidental delay damages" to Transdyn. We affirm the trial court's judgment.

## BACKGROUND

In September 2000, the City of Austin entered into a construction contract with Cajun Contractors, as general contractor, to build the Walnut Creek Wastewater Treatment Plant in Austin ("Walnut Creek project").[1] Cajun, in turn, entered into a $3.7 million subcontract with ATS to provide the electrical and instrumentation work on the Walnut Creek project. ATS's scope of work under its subcontract included providing "all labor, materials, and equipment to design, furnish, install, calibrate, test, adjust, and place in operation the facility monitoring and control system"—also known as the process instrumentation and control system ("PICS"). PICS includes the sensors and instruments used to monitor and control the facility and permit remote access and control of those sensors and instruments.

Although ATS was responsible for PICS under its subcontract with Cajun, the specifications for the Walnut Creek project required that the City of Austin approve the PICS supplier and installer. ATS asked Transdyn, one of four city-qualified PICS suppliers, to submit a proposal to supply the PICS for the Walnut Creek project. ATS told Transdyn, and the project specifications provided, that the Walnut Creek project was scheduled to be completed 360 days after construction began. Transdyn's representative also testified that ATS's representative told Transdyn

---

[1] The facts recited in this opinion are taken from the testimony and exhibits admitted at trial.

2

that ATS's PICS budget was $1,000,000. ATS also sent Transdyn the project specifications covering PICS.

Based on all the information it had received from ATS, Transdyn submitted a $1,000,000 proposal "for furnishing, but not installing, portions of the [PICS] for the subject project as defined in [the sections of the project plans and specifications ATS] provided." The proposal also specified that Transdyn would provide certain training. The PICS section of the project plans, which were incorporated by reference into the proposal, included the following payment terms for the PICS part of the project:

**Partial Payment Limits**:

A. Partial payments for Work required under PICS Subsystems is shown as a percent of Lump Sum Item amount:

    1.    Submittals, not including **PICS** O&M manuals, 15 percent maximum,

    2.    Performance Acceptance Tests **PAT**, 20 percent, minimum.

    3.    Reliability Acceptance Tests **RAT**, 20 percent, minimum.

    4.    PICS O&M manuals, 5 percent, minimum.

(Emphasis in original). Transdyn's proposal stated that payment would be according to "mutually agreeable payment terms resulting in neutral cash flow for the project."[2] ATS accepted Transdyn's proposal and authorized Transdyn to begin work on the project on September 14, 2000.

---

[2] Transdyn's representative testified at trial that "neutral cash flow" is "a common term used in the construction industry to indicate pay as you go . . . so as you incur the costs, you receive payment for them."

Approximately two months after construction began on the Walnut Creek project, Transdyn, ATS, and Cajun agreed on the following payment schedule for Transdyn's work:

As agreed upon at our partnering meeting, the following table is Transdyn's revised Milestone/Payment Schedule. Note that the payment dates are the estimated dates for payment of the invoice and are approximately one month after the issuing of the invoice.

| Milestone Payments | Cont. Amt: $1,000,000 | | % Retained 5% | |
|---|---|---|---|---|
| | Milestone % | Payment | Less Retainage | Expected Pay Date |
| Acceptance of Schedule/Schedule of Values/Hardware List | 5% | $50,000.00 | $47,500.00 | Oct-00 |
| Hardware Submittal Approval | 10% | $100,000.00 | $95,000.00 | May-01 |
| Hardware Shipped to Staging | 40% | $400,000.00 | $380,000.00 | Jan-01 |
| Performance Acceptance Tests Complete | 20% | $200,000.00 | $190,000.00 | Aug-01 |
| Reliability Acceptance Tests Complete | 20% | $200,000.00 | $190,000.00 | Sep-01 |
| O&M Manual Approved | 5% | $50,000.00 | $47,500.00 | Sep.-01 |
| Final Payment | | $50,000.00 | $50,000.00 | Sep.-01 |
| | 100% | | $1,000,000.00 | |

(hereinafter, "milestone payment schedule"). Transdyn's representative testified that the purpose of this agreement was to achieve the "mutually agreeable payment terms resulting in neutral cash flow"

4

described in Transdyn's original proposal by requiring ATS to pay Transdyn approximately one month after receiving Transdyn's invoice for each milestone. ATS's representative testified that this agreement meant that Transdyn would be paid a certain amount after each milestone was reached and final payment after the last milestone was reached, rather than by a date certain or invoice date.

In addition to modifying the contract's payment terms, ATS and Transdyn also later agreed to modify the training provisions of their contract. This modification resulted from requests by the project engineers that Transdyn make certain design changes to the PICS. Transdyn notified ATS that making the requested changes would require a change-order and an increase of $11,375.61 to the parties' contract. After negotiations, the parties agreed to incorporate the changes into the existing contract at no extra charge to ATS and, in exchange, release Transdyn from some of its obligation to provide post-installation training.

Transdyn made the requested changes to the PICS system, but when PICS was installed and ATS requested a week of training from Transdyn, the parties realized there was a misunderstanding about the modification. Transdyn contends that it had agreed to perform the change-order work—valued at $11,375—in exchange for a release from its entire three-week training commitment—valued by Transdyn at $12,000. ATS contends that it only agreed to release Transdyn from two of the three weeks of training and that Transdyn was still required to provide one week of training. Because the parties could not resolve this matter during construction and because ATS was under construction deadlines, ATS provided all three weeks of the training.

There were other problems between Transdyn and ATS on the Walnut Creek project, the most significant of which was a delay in completion of the project. The project was originally

5

scheduled to finish by September 2001, but it was not ready until June 2002. This was due, in part, to the fact that Austin experienced unusually heavy rainfall in the autumn of 2000 and, in part, to problems caused by the project engineer, the general contractor, other subcontractors, and either Transdyn or ATS, depending on the party testifying. The end result for Transdyn was that it had to wait on the delays to complete its portion of the contract and it did not receive its final, and largest, payment in September 2001 when the project was expected to be complete. Transdyn also complained that ATS did not pay Transdyn's initial invoices in a timely manner.

ATS, however, argued it was not responsible for the delay and, in fact, that Transdyn itself was responsible for delays. Specifically, ATS contends that the engineers and other contractors had to delay testing the PICS because Transdyn had ordered its engineer, without whom testing could not occur, to leave Austin right before PICS testing. ATS also contends that Transdyn was responsible for the numerous PICS problems and defects discovered during testing and that these defects had to be repaired before the project could continue. Transdyn contends that, despite all the delays on the project, it had shipped the PICS equipment according to the terms of the parties' agreement and had PICS ready to be installed, started, and tested in September 2001, which was the original completion date for the construction project and the final payment date on the parties' payment schedule.

Because of the delays and problems with payment throughout the project, Transdyn sent ATS demands for payments and asked for assurances about the delays. On January 7, 2002, while the project was still ongoing and the PICS was still not complete, but after Transdyn states it had completed 95% of its work, Transdyn submitted its final invoice for the project and demanded

6

the remainder due under the entire contract—$477,500. When ATS did not pay, Transdyn filed this suit, alleging breach of contract by ATS and seeking damages and attorney's fees. ATS counterclaimed for breach of contract as well, alleging that Transdyn had failed to complete its work and had failed to provide the agreed-upon one week of training per the parties' oral modification.

After a bench trial, the trial court found that ATS had materially breached the contract by not paying Transdyn according to the terms of the contract and awarded Transdyn its damages, including incidental damages, and attorney's fees. The trial court also found that Transdyn had breached the contract by failing to perform terminations and repairs on the PICS, and awarded ATS its damages and attorney's fees for that breach. After the offsets for Transdyn's breach were credited, the trial court awarded Transdyn $82,403 in damages, plus pre-judgment interest of $28,451.36, $50,000 in attorney's fees, and $9,619 in court costs. ATS appeals.

## DISCUSSION

In six issues on appeal, ATS contends that the trial court erred by (1) admitting certain testimony by Transdyn's corporate representative, Brian Luiz, (2) failing to credit ATS with an offset for training costs incurred because of Transdyn's breach of contract, and (3) awarding Transdyn "incidental delay damages."

### *Testimony of Brian Luiz*

In its first issue, ATS contends that the trial court erred in admitting, over objection, Brian Luiz's testimony about the change-order request and agreed modification to the training requirement in the parties' contract. ATS objected to Luiz's testimony on the grounds that it was

7

inadmissible hearsay and that Luiz had no personal knowledge of the change-order or the parties'

modification negotiations.   ATS objected to the following testimony by Brian Luiz:

Q:      [Transdyn's Counsel] Are you familiar with this Change Order dispute I described to the Judge in my opening statement?

A:      I am.

Q:      Will you please convey, in your own words to Judge Livingston, what Transdyn[]'s position is with regards to the Change Order components of this litigation?

ATS's counsel:      Excuse me, Your Honor, I'm going to object to any testimony from this witness until it's proven that he has first-hand knowledge of this, because I think the discovery shows he was not involved in the first hand—on a first-hand basis with respect to the negotiation of this alleged Change Order.

The Court:      Establish what personal knowledge, if any, he has or what other knowledge he might have.

Transdyn's counsel:      Sure, Your Honor.   And he's our corporate representative. We're just asking him to say what this—what we've pled, what this company's position is with regards to it.   Not anything that he hasn't—doesn't have direct knowledge of.

The Court:      Okay.

ATS's Counsel:      Okay.

Q:      [By Transdyn's Counsel] Okay.   Mr. [Luiz], were you involved with your employees and personnel in discussing the Change Order disputes while the project was on-going?

A:      I was.

Q:      Okay.   Did you ever have any discussions with anyone at ATS about the Change Order dispute?

A:      I believe I did.

8

Q:      Okay.  Who?

A:      Mr. House.

Q:      Okay.  And who at Transdyn[] did you discuss the Change Order dispute with?

A:      With Mr. Smith and Mr. Maxwell.

Q:      Okay.  And both of whom work underneath you, correct?

A:      That's correct.

Q:      Okay.  And you testified earlier at some point, you started getting copied on a lot of the correspondence that we've seen and will be seeing; is that correct?

A:      That's correct.

Q:      Did any of that correspondence involve this Change Order dispute?

A:      The letter I previously reviewed that illustrated the cost of those Change Orders—of that Change Order was presented to me in a normal course of our reading file.

Q:      Okay.  And you—you reviewed it then and familiarized yourself with Transdyn[]'s position concerning the Change Order dispute?

A:      I did.

Q:      Okay.  What is Plaintiff's Exhibit No. 15?

A:      That is the bid summary as prepared on June 22nd 2000 for this project.

Q:      Okay.  And it itemized and details out what Transdyn[] was going to perform and how—and what internally it cost or how it tracked the cost of this job, correct?

A:      That's correct.

Transdyn's Counsel:  Your Honor, we move to admit Exhibit 15.

ATS's Counsel:       No objection, Your Honor.

9

The Court:          It's admitted.

Q:     [By Transdyn's Counsel] Can you please convey to the Judge what Transdyn[]'s position is with regards to the Change Order Dispute?

A:     It was my understanding that when we prepared the Change Order, the cost for that Change Order was $11,000 and some added amount of money—$11,000 plus.

ATS's Counsel:     Excuse me, Your Honor. Objection to this witness testifying to any—what anybody else told him about the presentation of the Change Order.

The Court:     He hasn't done that yet. So far he just said it's his understanding that the cost was going to be $11,000.

ATS's Counsel:     And I'm entitled to know—he's testified to what his understanding was. And he said his understanding came from Maxwell or Smith. The background of this, Your Honor, is Mr. Smith and Mr. Harutanian had a conversation heard—overheard by Mr. House. Those are the three parties that have first-hand knowledge of what this alleged agreement is. Anything this witness is going to testify about is going to be hearsay that he got from talking to Smith or somebody else. He has no first-hand knowledge of this alleged agreement on this Change Order.

The Court:     Well, so far he hasn't related what anybody told him. All he's saying is he thinks it was $11,000. So far that's okay. He thinks it was $11,000. You can cross-examine him on that point. But, please, don't tell us what anybody else told you, except obviously Mr. House, you can certainly tell us what he said.

The Witness:     Okay.

The Court:     Go ahead Mr. Spencer.

Q:     [By Transdyn's Counsel] Okay. Again, what is Transdyn[]'s position with regard—in this litigation with regards to this Change Order?

10

A:     That the $11,000 that was shown on the earlier document of the cost, was the cost to perform the Change Order. No Change Order was issued on the project at its conclusion. It was my understanding that that was in exchange for the PLC, Programmable Logic Controller training on the project, which we had estimated at $12,000.

ATS's Counsel:     Well, may I take him on voir dire?

The Court:     No.

ATS's Counsel:     Okay. I'm not entitled to know from whom he gained that understanding?

The Court:     When you cross-examine him you can ask him whatever you want. So far there's no point in you taking him on voir dire. It's not different from your cross-examination. Just be patient, you're going to get to have him and ask him whatever you want when it's your turn to cross-examine him. You can voir dire him for the admissibility of the document or something like that. So far he hasn't said anything that would justify you interrupting the direct examination about something—

ATS's Counsel:     All right.

Q:     [By Transdyn's Counsel] Mr. [Luiz]—

The Court:     I'm sorry. I missed the last part. In exchange for what?

The Witness:     In exchange for the cost that we had for the PLC training that is shown on Exhibit 15, down towards the middle of the page there's a 12,000-dollar cost item there.

The Court:     Okay.

Q:     [By Transdyn's Counsel] Okay. And how much is—do you recall even approximately how much ATS is attempting to assert as an offset to our claim for this—this training—for a part of the training obligation?

A:     I thought it was 17,000, but I could be incorrect. But it was more than the 12,000.

11

Q:      It was more.  Okay, does it appear that the amount of the Change Order is almost the exact—it's 11,000 and some change.  Does it appear to be almost the exact same amount as we had budgeted for this actual training, for all of the training here, according to Exhibit 15?

A:      It does.

Q:      Okay.  Would—did you ever authorize anybody from Transdyn[] to—to just partially trade out that—that obligation?

A:      I did not.

Q:      Would you have?

A:      Not at those costs, no.

Q:      Okay.  Because it doesn't make sense that you would have traded out $8,000 for $11,000.  Is that what you're getting at?

ATS's Counsel:        Well, Your Honor, that's leading.

The Court:             Sustained.

Transdyn's Counsel:  Okay.

The Witness:           No what—

The Court:             Hang on, hang on.  He's going to ask you another question.

The Witness:           Okay.  I'm sorry.

Q:      [By Transdyn's Counsel] We estimated the PLC training here, according to our bid, which predates this whole dispute, we estimated it at $12,000 for all three weeks; is that correct?

A:      That's correct.

Q:      Okay.  And so if you divide that $12,000 by three, what does that come out to a week?

A:      $4,000 a week.

Q:     Okay. And what's your understanding with regards to the dispute as far as the two versus three weeks? What is—what is their position?

A:     I understand their position to be that in exchange for the 11,000-dollar Change Order, we were only going to provide one week of training and they were going to delete two weeks of the training.

Q:     Okay. And what is Transdyn[]'s position with regards to that?

A:     Our position is . . . that we traded all of the training for that.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *In re J.P.B*, 180 S.W.3d 570, 575 (Tex. 2005). A trial court abuses its discretion when it acts without regard to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985).

The rules of evidence define hearsay as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tex. R. Evid. 801(d). As the trial court observed, the objected-to portion of Luiz's testimony contains no out-of-court statements—Luiz did not testify about what other people told him about the modification negotiations. Accordingly, his testimony was not hearsay and the trial court properly overruled ATS's objection.

ATS also argues that the objected-to portion of Luiz's testimony was not based on his personal knowledge as required by Rule 602 of the Texas Rules of Evidence. Under Rule 602, a witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Tex. R. Evid. 602. Personal knowledge is "[k]nowledge gained through firsthand observation or experience, as distinguished from a belief

13

based on what someone else has said." *Black's Law Dictionary* 951 (9th ed. 2009). Thus, a witness can only testify about those matters, facts, or events that he perceived firsthand. *See Strickland Transp. Co. v. Ingram*, 403 S.W.2d 192, 195 (Tex. Civ. App.—Texarkana 1966, writ dism'd) ("Perception of fact by the senses of the witness, that is, firsthand knowledge, is a fundamental qualification of testimonial competency.").

Luiz testified only about matters that he perceived firsthand as Transdyn's vice president:

- Transdyn's litigation position regarding the modification;

- His understanding of ATS's position on damages regarding the modification;

- The identity of people with whom he discussed the change order or related modification;

- The identification, existence, and contents of corporate documents;

- That Transdyn had valued the cost of three weeks of training at $12,000 in its pre-contract bid summary;

- That $12,000 divided by three weeks equals $4,000 per week;

- That the change order request was for approximately $11,000 worth of work and that amount was almost equal to the amount Transdyn budgeted for training in its bid summary; and

- That he had not, and would not have, authorized anyone from Transdyn to trade $12,000 worth of work for only two weeks of training.

Luiz did not testify about the negotiations leading up to the modification or what was said or agreed to in those negotiations. Based on our review of this testimony, we conclude that Luiz testified about

14

matters about which he had personal knowledge. Accordingly, the trial court did not abuse its discretion in overruling ATS's objection.[3] ATS's first issue is overruled.

## *Training Modification*

ATS's second issue on appeal also involves the parties' modification to the contract's training provisions. At trial, ATS argued that the parties agreed to eliminate only two of the three weeks of training in exchange for the change-order work. Transdyn argued at trial that ATS agreed to eliminate all three weeks of training. The trial court made no finding regarding the agreed training modification, nor does the judgment award ATS damages for the training costs. Thus, we may infer that the trial court found that the parties agreed to eliminate all three weeks of training. *See* Tex. R. Civ. P. 299 (omitted elements will be supplied by presumption in support of judgment if supported by evidence). ATS contends the trial court's finding is in error because there was legally or factually insufficient evidence that the parties agreed to eliminate all three weeks of Transdyn's PLC training obligation in exchange for the change-order work.

We review the evidence supporting the trial court's findings of fact for legal and factual sufficiency by the same standards applied to a jury verdict. *See Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). For a legal sufficiency challenge, we review the evidence in the

---

[3] Even if the trial court had erred in allowing Luiz's testimony, either because he lacked personal knowledge or because his testimony included inadmissible hearsay, ATS fails to explain how that error probably caused the rendition of an improper judgment. To reverse a judgment based on an error in the admission or exclusion of evidence, the complaining party must show that the error probably resulted in the rendition of an improper judgment by demonstrating that the judgment turns on the particular evidence admitted or excluded. Tex. R. App. P. 44.1(a); *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001).

15

light most favorable to the judgment, crediting favorable evidence if a reasonable factfinder could, and disregarding contrary evidence unless a reasonable factfinder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005). We will sustain a legal sufficiency complaint if the record reveals (1) a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Id.* at 810. More than a scintilla of evidence exists if the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004).

In a factual sufficiency challenge, we consider and weigh all of the evidence in the record, both supporting and against the finding, to decide whether the finding should be set aside. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). We will set aside the judgment only if the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). In a bench trial, the trial court is the "sole judge of the credibility of the witnesses and the weight to be given their testimony." *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986). The trial court may believe one witness, disbelieve others, and resolve inconsistencies in any witness's testimony. *Id.* at 697.

Our review of the record indicates the following evidence supporting the trial court's implied finding that the parties agreed to eliminate all three weeks of training from the contract:

16

- Transdyn's pre-contract bid summary valuing three weeks of training at $12,000;

- Luiz's testimony that Transdyn valued three weeks of training at $12,000;

- Transdyn's letter to ATS stating that requested changes to the scope of work on the project would cost ATS $11,375.61;

- Luiz's testimony that no change-order was issued on the project;

- Transdyn's letter to ATS stating Transdyn's position that it had agreed to the perform the change-order work in exchange for three weeks of PLC training, not two; and

- Luiz's testimony that the change-order work was done as a "no cost change" because Transdyn was trading its costs incurred on the work for the cost it saved by not having to do the PLC training.

The only evidence contrary to the trial court's implied finding was an ATS employee's testimony that Transdyn's project manager told him that Transdyn had agreed with the project engineer to trade two weeks of training in exchange for the change-order work.

Considering this evidence in the light most favorable to the judgment and indulging every reasonable inference that would support the trial court's finding, we conclude that a reasonable and fair-minded person could conclude that the parties agreed to trade three weeks of training in exchange for $11,375.66 worth of change-order work. Accordingly, the evidence is legally sufficient to support trial court's implied finding.

Based on our review of all the evidence, we conclude that the trial court's finding was not against the great weight and preponderance of the evidence. While there is some evidence to indicate that Transdyn had agreed to trade two weeks, there is testimony and evidence suggesting otherwise. It is for the trial court, however, to resolve such conflicts. *Id.* at 696-97. The court could

17

have credited the testimony and evidence of the value of the work traded to conclude that the parties intended to trade three weeks of training for approximately $12,000 of change-order work. Accordingly, we conclude that the trial court's finding was supported by factually sufficient evidence. ATS's second issue is overruled.

### Incidental Damages

ATS's remaining issues on appeal challenge the trial court's award of incidental damages to Transdyn. The trial court awarded the incidental damages under article 2 of the Texas Uniform Commercial Code ("UCC"), which the court had previously determined governed the parties' contract. Under the UCC, a seller of goods can recover its damages, including incidental damages, "[w]hen the buyer fails to pay the price as it becomes due." Tex. Bus. & Com. Code Ann. § 2.709 (West 2009). Incidental damages under the UCC include "any commercially reasonable charges, expenses or commissions incurred . . . in the transportation, care and custody of goods after the buyer's breach . . . or otherwise resulting from the breach." *Id.* § 2.710 (West 2009).

With respect to its award of damages and incidental damages, the trial court made the following findings of fact:

- ATS and Transdyn entered into a contract for Transdyn to furnish "labor and materials related to the control equipment" for the Walnut Creek project;

- "ATS agreed to pay the agreed price and reasonable value for said electrical control system pursuant to the terms of the . . . [parties' contract]";

- Transdyn furnished the labor and control equipment materials "in accordance with the contractual requirements";

18

- Transdyn performed "all conditions, covenants, and promises to be performed by Transdyn pursuant to the . . . [parties' contract] with ATS except that it failed to perform the fiber optic terminations and Performance Acceptance Test . . . related repairs";

- "ATS failed to pay Transdyn pursuant to the [parties' contract]";

- "Transdyn made timely and contractually correct demands for payment . . . .";

- Transdyn is entitled to the "$67,227.00 balance due under the [parties' contract]"; and

- Transdyn is entitled to "incidental delay damages in the amount of $65,397.00."

## A. When Payment Became Due Under the UCC

In its third issue, ATS contends that the trial court erred in awarding incidental damages because Transdyn offered no evidence or insufficient evidence that ATS failed to pay Transdyn when payment became due under the terms of the parties' contract. Specifically, ATS contends that Transdyn failed to produce evidence that payment was due from ATS when Transdyn submitted its invoice requesting final payment. The parties disagree on when payment was due under the contract. Before we can determine whether Transdyn produced sufficient evidence that payment was due, then, we turn to the trial court's finding of when payment was due under the terms of the parties' contract.

Both parties agreed that the milestone payment agreement sets forth the parties' agreement about when Transdyn was to be paid. The parties disagree, however, on the meaning of that agreement. ATS argued at trial that payments were due under this agreement only after each milestone had been reached and, thus, final payment was not due until after the final

19

milestone—approval of the PICS manuals—was achieved. The testimony of both parties' witnesses established that the last three of the milestones listed in the payment agreement had not been reached when Transdyn sent its last invoice demanding final payment. Thus, ATS argues it did not owe the money when Transdyn demanded payment. Transdyn argued at trial that payment was due thirty days after it issued an invoice and, further, that final payment was due thirty days after the project was initially scheduled to be finished, or approximately November 30, 2001; thus, when it submitted its final invoice in January 2002, payment was past due.

Rather than make an express finding as to when the payment was due under the milestone payment agreement, the trial court simply found that "ATS failed to pay Transdyn pursuant to the [parties' contract]" and awarded Transdyn damages based on its contention that the delay began in November 2001. Nonetheless, because it was established at trial that the last three milestones had not been reached when Transdyn sent out its final invoice and because the trial court found that ATS breached the contract, the trial court necessarily found, as was argued by Transdyn, that final payment was due approximately November 2001. *See* Tex. R. Civ. P. 299 (omitted elements will be supplied by presumption in support of judgment if supported by evidence). The trial court could not have found that, as ATS argued, payment was due upon completion of each milestone and also have found that ATS was in breach of the contract. Accordingly, we determine that the trial court impliedly found that final payment was due on approximately November 30, 2001.

Based on this implied finding and also because ATS does not challenge the trial court's interpretation of this contract, we review the evidence to determine if it is factually and legally sufficient to support the trial court's implied finding that ATS did not pay Transdyn in full

20

by approximately November 30, 2001.  Our review of the record indicates the following evidence supporting the trial court's implied finding:

- January 15, 2002 invoice demanding payment in full;

- January 8, 2002 Transdyn letter to ATS stating that the contract should have been completed and fully paid by September 2001;

- January 15, 2002 letter from Transdyn's counsel to Cajun, Liberty Mutual Insurance Co., and Fidelity and Guaranty Insurance Underwriters, notifying them that ATS owes Transdyn $477,500 for work on Walnut Creek project;

- February 8, 2002 email from City of Austin project manager stating that no further payments will be made to Transdyn;

- Luiz's testimony that Transdyn was never paid within thirty days from the invoice date;

- Otis Maxwell's (Transdyn representative) testimony that Transdyn was never paid within thirty days from the invoice date;

- Bill Driesslein's (ATS's chief financial officer) testimony that ATS paid Transdyn's invoices up until the time "the difficulties all arose" when Transdyn "left the job"; and

- Driesslien's testimony that Transdyn was not paid according to the parties' payment agreement.

Considering this evidence in the light most favorable to the judgment and indulging every reasonable inference that would support this finding, we conclude that a reasonable and fair-minded person could conclude that ATS did not pay Transdyn in full by November 30, 2001.

We also note that ATS's brief on appeal cites to no evidence in the record indicating that ATS paid Transdyn by the end of November 2001, nor did we find evidence contrary to the finding.  Therefore, we cannot conclude that the trial court's finding that ATS did not pay Transdyn

21

in full was so against the great weight and preponderance of the evidence that it was clearly wrong and unjust. *See Dow Chem. Co.*, 46 S.W.3d at 242.

We hold that the evidence was legally and factually sufficient to support the trial court's finding that "ATS failed to pay Transdyn pursuant to the [parties' contract]." We overrule ATS's third point of error.

### B.    Overhead Expenses

In its fourth issue, ATS contends that the trial court erred in awarding incidental damages because the "incidental delay damages" requested by Transdyn are not recoverable by a seller under the UCC. Specifically, ATS asserts that overhead costs, which were included in Transdyn's incidental damages, are unrecoverable consequential damages.[4] Thus, the question we must answer is whether overhead expenses are recoverable as incidental damages under the UCC.

ATS argues that overhead costs are not recoverable as incidental damages because section 2.709 does not specifically provide for the recovery of "reasonable overhead." *See* Tex. Bus. & Com. Code Ann. § 2.709. As support, ATS points to section 2.708's inclusion of "reasonable overhead" as an element of a seller's damages for non-acceptance or repudiation. *See id.* § 2.708

---

[4] Transdyn used the Eichleay formula to determine its incidental damages. The Eichleay formula calculates a contractor's unabsorbed home overhead costs attributed to a government-caused delay in connection with a government construction contract. *See Eichleay Corp.*, ASBCA No. 5183, 60-2 B.C.A. (CCH) ¶ 2688, *aff'd*, 61-1 B.C.A. (CCH) ¶ 2894 (1960). "Home office overhead costs" are the costs incurred by the contractor for maintaining its whole business, thus, they cannot be attributed to any single contract or job. *See id.* The Eichleay formula seeks to equitably allocate the portion of the home office overhead costs allocable to a particular contract. *Id.*; *see also Chilton Ins. Co. v. Pate & Pate Enters., Inc.*, 930 S.W.2d 877, 892 n.10 (Tex. App.—San Antonio 1996, pet. denied). Thus, Eichleay damages compensate the injured contractor for the "extra" costs incurred as a result of the delay.

(West 2009). We are not persuaded by ATS's argument. The fact that overhead expenses are specifically mentioned in section 2.708 as being a possible component of a seller's profit does not mean that they cannot be incidental damages recoverable under section 2.709. Instead, we look to section 2.710's definition of incidental damages to determine what incidental damages can include:

> Incidental damages . . . include any commercially reasonable charges, expenses or commissions incurred in stopping delivery, in the transportation, care and custody of goods after the buyer's breach, in connection with return or resale of the goods or otherwise resulting from the breach.

*Id*. § 2.710. The commentary to section 2.710 adds that the purpose of this section is

> [t]o authorize reimbursement of the seller for expenses reasonably incurred by him as a result of the buyer's breach. The section sets forth the principal normal and necessary additional elements of damage flowing from the breach but *intends to allow all commercially reasonable expenditures made by the seller*.

*Id.* (emphasis added). Although we have found no cases addressing whether Eichleay-type damages are incidental damages under the UCC, we conclude that the types of expenses included in overhead cost calculations—i.e., business expenses, such as rent, utilities, salaries, insurance premiums, security costs—can fall within the UCC's definition of incidental damages if those costs were commercially reasonable charges or expenses incurred as a result of the buyer's breach. *See Wagner & Brown, Ltd. v. Sheppard*, 282 S.W.3d 419, 425 (Tex. 2008) ("overhead" expenses include administration, supervision, office services, and warehousing expenses); *Strauss v. Continental Airlines, Inc.*, 67 S.W.3d 428, 440 n.7 (Tex. App.—Houston [14th Dist.] 2002, no pet.) (overhead

expenses include "office rent, salaries to employees, payroll taxes, and other fixed costs of doing business"). We overrule ATS's fourth point of error.

### C. Reasonable Certainty of Incidental Damages

In its fifth issue, ATS asserts that the trial court erred in awarding incidental delay damages because there was no evidence or insufficient evidence "of the reasonable certainty of such damages or that such damages were actually incurred." Specifically, ATS contends that, under *Malone v. Carl Kisabeth Co.*, 726 S.W.2d 188, 192 (Tex. App.—Fort Worth 1987, writ ref'd n.r.e.), Transdyn had to prove that it paid a third party to store the equipment or that it was foreclosed from storing other equipment on its own premises.

We note that Transdyn's incidental damages include more than just its storage expenses. Nonetheless, assuming without deciding that *Malone* applies to the facts of this case, the *Malone* court declined to award the seller its storage costs as incidental damages because there was no proof that the seller "suffered any loss by having to pay to have [the product] stored elsewhere or was foreclosed from storing other [product] on [his] premises due to [the product] occupying space." *Id*. Here, Transdyn's witness testified the equipment was "taking up valuable space in our shop that we would loved to have had to stage other projects." Transdyn's witness also testified that Transdyn had to maintain a security system for the warehouse, it had to pay insurance for the warehouse if equipment was in it, and that Transdyn incurred staff expenses relating to the inventory in the warehouse. Thus, Transdyn met the *Malone* requirements.

Regarding its incidental damages, Transdyn's witness also testified that Transdyn incurred overhead and interest expenses because of the delays caused by ATS. Documents admitted

into evidence, mostly consisting of letters from Transdyn to ATS complaining about the delays, specifically refer to damages being incurred as a result of the delays. Considering this evidence in the light most favorable to the judgment and indulging every reasonable inference that would support the trial court's finding, we conclude that a reasonable and fair-minded person could conclude that Transdyn incurred expenses as a result of ATS's breach. Accordingly, we hold that the evidence is legally sufficient to support the trial court's judgment.

In reviewing all the evidence, we find nothing that controverts the evidence that Transdyn incurred expenses as a result of the delay. Accordingly, we hold that the evidence is factually sufficient to support the trial court's conclusion that Transdyn incurred incidental damages. ATS's fifth issue is overruled.

**Causes for the Delay**

In its final point of error, ATS asserts the trial court erred in awarding incidental delay damages because there was no evidence or factually insufficient evidence that Transdyn's delay damages resulted from ATS's breach or that ATS caused any delays. Our review of the record indicates the following evidence supporting the trial court's finding that Transdyn incurred incidental delay damages as a result of ATS's breach of the contract or that ATS caused delays:

- Testimony and handwritten notes of Luiz that ATS representative told him that the contract would be complete in approximately 360 days;

- September 14, 2000 letter and purchase order from ATS accepting contract with Transdyn and authorizing Transdyn to proceed with contract;

- October 26, 2000 email from Transdyn to ATS stating that Transdyn is being affected by delays on the project;

25

- November 9, 2000 Revised Payment Schedule from ATS indicating that expected pay date for final payment was September 2001;

- Luiz's testimony that Transdyn expected to be paid within thirty days of invoice date, but was never paid within thirty days of invoice dates;

- April 16, 2001 letter from Transdyn to ATS requesting payment of past due invoices and notifying ATS that Transdyn is ready to ship equipment;

- August 7, 2001 letter from Transdyn complaining about delays and damages caused by the delays;

- Luiz's testimony that Transdyn submitted its work in a timely fashion and was never cited for delays;

- Luiz's testimony that Transdyn incurred additional costs, including financing costs, as a result of the delays in the construction project;

- Luiz's testimony that Transdyn was ready to perform on the contract but that ATS was not ready; specifically that Transdyn had the equipment ready to go in September 2001, but that it was not started until the early part of 2002;

- October 2, 2001 letter from Transdyn to ATS complaining about schedule delays, indicating that Transdyn was able to perform according to agreed schedule, and stating that Transdyn was incurring additional costs as result of the schedule delays and of not being paid in a timely fashion;

- Luiz's testimony that approval of Transdyn's hardware submittals was delayed by sixty days;

- November 7, 2001 letter from Transdyn to ATS setting forth the damages Transdyn was incurring as a result of the delays on the construction project;

- January 8, 2002 letter from Transdyn stating that Transdyn should have been paid in full by September 2001 and that it had incurred damages as a result of the delay in payments;

- Luiz's testimony that as of November 7, 2001 Transdyn was waiting on ATS;

- Transdyn exhibit setting forth its Eichleay damages resulting from delays;

- Luiz's testimony that Transdyn's delay damages resulted from 205-day delay between the contract completion date and the date Transdyn was finally paid;

- Luiz's testimony that, under the terms of the contract, ATS was responsible for accepting Transdyn's schedule of values and hardware list;

- Luiz's testimony that the specifications for the project warranted that the project will be completed in 365 days or the owner would assess liquidated damages against the prime contractor;

- Luiz's testimony that Transdyn was "contracted to build the job in 365 days, and we were damaged without any compensation for an extension of that";

- Luiz's testimony that Transdyn incurred damages because Transdyn was required to complete the project in 365 days and had the equipment ready for delivery in that time frame, but could not ship the equipment because of the delays on the project;

- Otis Maxwell's testimony regarding ATS delays, including his testimony that work outside Transdyn's scope of work, which affected Transdyn's ability to complete its work, was not completed in a timely fashion;

- March 6, 2002 letter from Transdyn to ATS referencing delays and costs incurred as a result of those delays;

- Cajun's letters to ATS regarding "Notification of Delay to Project Schedule";

- March 22, 2001 "48 Hour Notice of Failure to Perform" from Cajun to ATS;

- October 15, 2001 letter from Cajun to ATS regarding "Notification of Delay to Project Schedule" and informing ATS that it was responsible for several delays to the project;

- October 15, 2001 "48 Hour Notice of Failure to Perform" from Cajun to ATS;

- Elliot House's testimony that Transdyn had all the equipment to the project site by September 2001; and

- Elliot House's testimony that Cajun assessed damages against ATS for delays in the construction project.

27

Considering this evidence in the light most favorable to the trial court's finding and indulging every reasonable inference that would support the trial court's finding, we conclude that a reasonable and fair-minded person would conclude that ATS caused delays and that Transdyn incurred incidental damages as a result of the delays. Accordingly, we hold that the evidence was legally sufficient to support the trial court's finding.

ATS provided the following controverting evidence:

- October 27, 2000 email from ATS to Cajun stating that delay in submittal approvals were caused by Cajun;

- December 11, 2000 fax from ATS to Wesco complaining about delays in the approval of submittal requests;

- March 12, 2001 City of Austin project notes for Walnut Creek project indicating that engineers were responsible for delay in submittal approval;

- March 12, 2001 letter from ATS to Cajun regarding delays caused by rain and failure to receive submittal approvals;

- October 19, 2001 letter from ATS to Cajun responding to allegations that ATS delayed the project and complaining that Cajun was responsible for delays on the project;

- Luiz's testimony that the engineers on the project were responsible for the hardware submittal approvals;

- October 2, 2001 letter from Transdyn to ATS indicating that Transdyn was aware that the activities of others were causing ATS to be delayed;

- Luiz's testimony that ATS's representative told him that ATS had difficulty performing its work on the project due to problems that were out of ATS's control;

- Luiz's testimony that he was aware that ATS was not the only entity that could affect when the tests occurred; that the City of Austin, Cajun, the engineer, other subcontracts, and weather could affect when tests occurred;

28

- Testimony from Elliot House of ATS that the delays in the project were caused by excessive rain in the Fall of 2000, other contractors' failure to complete work that had to be completed before ATS's work, including the approval of project submittals, Transdyn's failure to assist with the final testing of its equipment, and defective equipment Transdyn provided; and

- Testimony from Elliot House that he disagreed with Transdyn's contentions that the engineers were late in approving submittals.

The trial court resolved the conflicts in the evidence in favor of Transdyn by concluding that ATS caused delays and that Transdyn incurred damages as a result of those delays. Viewing all the evidence, we conclude the trial court's finding is not "so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *See Cain*, 709 S.W.2d at 176.

ATS also contends that to recover incidental delay damages Transdyn had to "(1) identify each action causing a delay; (2) identify the party responsible for this action; (3) locate this action in the schedule; and (4) identify the impact of the delay." *See Rowan Cos. v. Southwest Tenant Constr., Inc.*, No. 01-95-01514-CV, 1999 WL 97545, at *4 (Tex. App.—Houston [1st Dist.] Feb. 18, 1999, no pet.) (mem. op.). We disagree. *Rowan* is not a UCC case and, thus, does not address the determination of incidental damages under the UCC. *See id.* The UCC allows recovery of incidental damages "resulting from the breach." *See* Tex. Bus. & Com Code Ann. § 2.710. We can find no cases interpreting this UCC language to require the elements found in *Rowan*, and the cases that interpreted this language have only determined that it requires that the damages have been incurred prior to the breach; thus, they do not inform our decision here. *See* James J. White & Robert S. Summers, *Uniform Commercial Code* § 7-16(a) (5th ed. 1996).

ATS also cites to *City of Beaumont v. Excavators & Constructors, Inc.*, 870 S.W.2d 123 (Tex. App.—Beaumont 1993, writ denied), for the proposition that Transdyn has to prove that ATS was responsible for each act or omission which caused the delay. *City of Beaumont* is distinguishable for at least four reasons: (1) it is not a UCC case; (2) it involved a claim for "lost opportunity" damages incurred when a contractor allegedly was prevented from finishing a contract before it was due to be completed; (3) the contractor was seeking damages from a defendant that was not a party to its construction contract; and (4) the contract at issue contained a no-damage-for-delay clause. Accordingly, we decline to apply *City of Beaumont* to this case. We overrule ATS's sixth issue.

**CONCLUSION**

Because we conclude that the trial court acted within its discretion in admitting Luiz's testimony and the evidence was legally and factually sufficient to support the trial court's findings, we overrule ATS's issues on appeal and affirm the trial court's judgment.[5]

_____

Jan P. Patterson, Justice

Before Justices Patterson, Puryear, and Henson

Affirmed

Filed: August 24, 2010

_____

[5] Because Chief Justice Law was originally assigned to author this opinion, authoring duties were reassigned.